**NYCAL CORPORATION, Plaintiff,**

v.

**INOCO PLC and Downshire N.V., Defendants.**

**No. 96 CIV. 7159 LAK.**

United States District Court, S.D. New York.

Dec. 12, 1997.

See also, 968 F.Supp. 147.

Jeffrey E. Glen, DeForest & Duer, New York City, for Plaintiff.

Lawrence A. Blatte, Rosen & Reade, L.L.P., New York City, for Defendants.

## MEMORANDUM OPINION

KAPLAN, District Judge.

This lawsuit involves a claim by Nycal Corporation ("Nycal") that it was defrauded by Inoco PLC and Downshire N.V. (collectively, "Inoco") in connection with Nycal's 1991 purchase of a majority interest in Gulf Resources and Chemical Corporation ("Gulf") from Inoco. Inoco seeks summary judgment dismissing the complaint on the ground that it is barred by a release contained in a settlement agreement previously executed by Nycal. Nycal rejoins that the release does not cover its present claim and, in any case, itself was obtained by fraud.

### Facts

The essential facts in this dispute are as follows.[1]

---

1. The Court assumes familiarity with its prior opinions in this matter in *Nycal Corp. v. Inoco*

In early 1991, negotiations began between Nycal's chairman, Graham Ferguson Lacey, and David Rowland, president of Gulf and vice chairman of Inoco, concerning the possibility of Nycal acquiring Inoco's controlling interest in Gulf. On May 24, 1991, Nycal entered into a Stock .Purchase Agreement with Inoco (the "SPA") by which it agreed to purchase Inoco's interest in Gulf for approximately $34 million. The transaction closed on July 12, 1991.

Problems developed almost immediately after the closing. On July 15, 1991, Messrs. Lacey and William Horn were informed by Lawrence Mehl, Gulf's general counsel, that Gulf–Pac, a Gulf subsidiary, had received a £3.5 million loan from Interallianz Bank Zurich prior to the closing.[2] Mr. Lacey, outraged by this revelation, which he believed to be a violation of the terms of the SPA, stopped payment on a check to Inoco in the amount of £360,000.[3] This prompted a lawsuit by Inoco in the United Kingdom against a Nycal subsidiary and led Mr. Lacey to begin an investigation and audit of a variety of Gulf transactions that took place during Mr. Rowland's tenure as Gulf's. president.[4] Negotiations between all parties began, culminating in a series of settlement agreements, including one between Nycal and Inoco (the "Settlement Agreement"), on October 4, 1991.[5]

The Settlement Agreement between Inoco and Nycal contained the following language:

"Following the aforesaid [price] reduction, each party to the [SPA] hereby acknowledges that it has *no further claims arising out of the SPA or the transactions contem-*

*plated thereby or any guarantee given in relation thereto* by any person against any other party or guarantor or any officer or any other party or guarantor and *hereby waives any such claim as may now exist or as may arise after the date hereof.*"[6]

Despite this release, litigation between Nycal and Inoco has broken out again.[7] Nycal filed this suit in August 1996, alleging among other things that Inoco fraudulently induced Nycal to enter into both the SPA and the Settlement Agreement. Inoco now moves for summary judgment on these claims.

### *Discussion*

### I. *Alleged Fraudulent Inducement of the Stock Purchase Agreement*

According to Inoco, the release contained in the Settlement Agreement precludes Nycal's claim that it was fraudulently induced into the SPA. Nycal responds that this release does not extend to claims of fraudulent inducement. Since the question of the scope of the release is presented in the context of a motion for summary judgment, it is important as a threshold matter to identify the circumstances in which courts may resolve disputes over contract interpretation at the summary judgment stage.

 Summary judgment on a contract interpretation dispute is clearly permissible when the language of the contract provision in question is unambiguous.[8] In fact, it is not uncommon for courts to use language suggesting that this is the only scenario in which summary judgment on a contract interpretation dispute is appropriate.[9] Such suggestions are not entirely correct, however, as the Second Circuit recently has not-

---

*PLC,* 949 F.Supp. 1115 (S.D.N.Y.1997) (*"Nycal I"*) and *Nycal Corp. v. Inoco PLC,* 968 F.Supp. 147 (S.D.N.Y.1997) (*"Nycal II"*).

2. Def. 56.1 Statement ¶¶ 46, 47; Pl. 56.1 Statement ¶¶ 46, 47.

3. Def. 56.1 Statement ¶ 48; Pl. 56.1 Statement ¶ 48.

4. Def. 56.1 Statement ¶¶ 50, 51; Pl. 56.1 Statement ¶¶ 50, 51.

5. Braun Aff. Ex. L, M.

6. *Id.* Ex. M. (emphasis added).

7. *Id.* Ex. H.

8. See *Mellon Bank, N.A. v. United Bank Corp. of New York,* 31 F.3d 113, 115 (2d Cir.1994); *Wards Co. v. Stamford Ridgeway Assocs.,* 761 F.2d 117, 120 (2d Cir.1985); *Heyman v. Commerce & Indus. Ins. Co.,* 524 F.2d 1317, 1320 (2d Cir. 1975).

9. See, e.g., *Sayers v. Rochester Telephone Corp.,* 7 F.3d 1091 (2d Cir.1993); *Rothenberg v. Lincoln Farm Camp, Inc.,* 755 F.2d 1017, 1019 (2d Cir. 1985); *Schering Corp. v. Home Insurance Co.,* 712 F.2d 4, 9 (2d Cir.1983); *Schine v. Schine,* 250 F.Supp. 822, 826 (S.D.N.Y.1966). The commonality of this unfortunately persistent phrasing perhaps explains the erroneous statement in plaintiff's memorandum that "[i]t is . . . axiomatic that 'a motion for summary judgment may be

ed.[10] Rather, summary judgment is appropriate in a contract interpretation dispute whenever there is no genuine issue of fact, a situation that obtains not only when the language is unambiguous, but also when the language is ambiguous and there is relevant extrinsic evidence, but the extrinsic evidence creates no genuine issue of material fact and permits interpretation of the agreement as a matter of law.[11] The Court therefore properly may decide whether the release comprehends Nycal's claim of fraudulent inducement into the SPA if it finds either that the Settlement Agreement is unambiguous on this point [12] or that it is ambiguous but any extrinsic evidence fails to create a genuine issue of material fact as to the parties' intent. With this in mind, the next task is to determine whether the Settlement Agreement is ambiguous, a matter clearly within the province of the Court.[13]

### A. Is the Settlement Agreement Ambiguous as to Fraudulent Inducement Claims?

▆▆▆ "Contract language is ambiguous if it is reasonably susceptible of more than one interpretation...." [14] Under Inoco's proposed interpretation, the plain language of the release encompasses any and all claims having to do with the SPA, including claims of fraudulent inducement. In light of the broad language employed in the release, a reasonable person could conclude that it encompasses more than just claims which presuppose the validity of the SPA. On the other hand, Nycal suggests that the language "arising out of" does not extend to claims attacking the validity of the SPA, which arguably is a reasonable interpretation as well. The language alone simply does not dictate that one interpretation or the other is the only reasonable conclusion, as this Court previously suggested.[15] The Court therefore finds that the Settlement Agreement is facially ambiguous as to whether it releases claims of fraudulent inducement.

### B. Impact of the Extrinsic Evidence

As previously noted, a court appropriately may dispose of a contract interpretation dispute on summary judgment, although the

granted only where the agreements' language is unambiguous and conveys a definite meaning.'" (citations omitted). Pl. Mem. at 16.

**10.** *Mellon Bank,* 31 F.3d at 116. *See also Chrysler Capital Corp. v. Bankers Trust Co.,* 810 F.Supp. 74, 76 n. 2 (S.D.N.Y.1992); *United States v. American Society of Composers, Authors & Publishers,* 782 F.Supp. 778, 808 (S.D.N.Y.1991); *aff'd,* 956 F.2d 21 (2d Cir.), *cert. denied,* 504 U.S. 914, 112 S.Ct. 1950, 118 L.Ed.2d 554 (1992).

**11.** *See Mellon Bank,* 31 F.3d at 116 (citing *Williams & Sons Erectors v. South Carolina Steel,* 983 F.2d 1176, 1183–84 (2d Cir.1993) (citing *Antilles Steamship Co. v. Members of Am. Hull Ins. Syndicate,* 733 F.2d 195, 207 (2d Cir.1984) (Newman, J., concurring))); *Borkan v. Quest Medical Inc.,* No. 95 Civ. 10381(MBM), 1996 WL 445361, at *3 (S.D.N.Y. Aug.7, 1996) ("If all the extrinsic evidence supports a single interpretation, the court may grant summary judgment for the party advocating the interpretation, almost as if the language had been unambiguous in the first place.") Although it is unnecessary to resolve the question here, at least two cases in this district suggest that the interpretation of an ambiguous contract is an issue of law where there is no extrinsic evidence. *See Chrysler Capital,* 810 F.Supp. at 76 n. 2; *American Society,* 782 F.Supp. at 808 ("[I]f there is no genuine dispute as to the material facts relevant to the discernment of the draft-

ers' intentions—even if the evidence is extrinsic to the contract itself—the court may interpret the contract as a matter of law, based on those undisputed facts, and hence summary judgment may be appropriate.")

**12.** Nycal asserts that the Court's holding in *Nycal I* that the Settlement Agreement is ambiguous precludes Inoco from arguing that the Settlement Agreement unambiguously released claims for fraudulent inducement. Pl. Mem. at 13 (citing *Nycal I,* 949 F.Supp. at 1122). That assertion is erroneous. The finding of ambiguity in *Nycal I* was addressed to the issue whether the Settlement Agreement discharged all post-closing obligations of the parties to the SPA, not to the distinct issue of whether the Settlement Agreement released fraudulent inducement claims, 949 F.Supp. at 1120–22. Nycal conflates these issues. The question of ambiguity on the specific point of whether fraudulent inducement claims were released by the Settlement Agreement was not decided in *Nycal I.*

**13.** *See, e.g., Mellon Bank,* 31 F.3d at 115; *Fireman's Fund Ins. v. Siemens Energy Automation,* 948 F.Supp. 1227 (S.D.N.Y.1996).

**14.** *Burger King Corp. v. Horn & Hardart Co.,* 893 F.2d 525, 527 (2d Cir.1990).

**15.** *Nycal I,* 949 F.Supp. at 1121.

contract is ambiguous, if the court finds either that there is no relevant extrinsic evidence or that there is relevant extrinsic evidence, but such evidence is so one-sided that it does not create a genuine issue of material fact. The next step, therefore, is to determine whether there is any relevant extrinsic evidence and, if so, whether it creates a genuine issue of material fact as to the proper interpretation of the Settlement Agreement.

Inoco's extrinsic evidence consists of the testimony of Messrs. Lacey and Rowland, who were the sole representatives of Nycal and Inoco, respectively, during the negotiations that led to the Settlement Agreement.[16] Lacey and Rowland testified that they personally believed the Settlement Agreement to be a general release, encompassing fraudulent inducement claims.[17] Their testimony was not limited to their subjective beliefs, however. Lacey testified also that "Rowland said to [me] ... 'I will not enter into a settlement agreement that is not a complete, comprehensive binding, hold harmless agreement under English law against me, Inoco ....' "[18] Rowland's testimony concerning what was objectively expressed between them at the time was consistent. Recalling the negotiations, he stated that Lacey told him, "I can get the boards of Nycal and the boards of Gulf—and he kept saying how reluctant it was for Gulf—how reluctant Gulf was to give a full, final release."[19] Rowland responded by seeking to clarify the nature of the proposed release: "Do we understand that's the end of it, no one can ever come

back to me?"[20] Lacey replied, "That's my intention."[21]

In response to Inoco's extrinsic evidence, Nycal invites the Court's attention to the deposition testimony of Mr. William C. Horn, a member of the Executive Committee appointed by Nycal to oversee the negotiation of the Nycal–Inoco settlement.[22] Horn described his personal understanding of the meaning of the Settlement Agreement: "The Nycal settlement, I believed, encompassed the impending Inoco suit for the balance of the purchase price, and the Nycal claim for loss of benefit or bargain due to the breach of the cash and cash equivalence requirement" and did not therefore involve a general release.[23] However, Horn testified also that he did "not recall any discussion regarding the scope of the Inoco–Nycal settlement" among either the Nycal Board or the Executive Committee members and further that "Mr. Lacey simply never mentioned the releases or their scope to me."[24]

In addition to the Horn testimony, Nycal relies on a document which it claims demonstrates that Inoco intended the release to be a limited one: the minutes of the October 4, 1991 Inoco board meeting.[25] Item 3 of the minutes reports that Mr. Rowland informed Inoco's board of an agreement with Gulf concerning the purchase of Gulf's Lawgra Ltd. subsidiary and a settlement of outstanding issues between Gulf and Inoco.[26] Nycal then points to Item 4 of the minutes, which reports that Mr. Jeremy James:

---

**16.** Graham Ferguson Lacey was the sole representative of Nycal and Gulf during the negotiations that produced the Settlement Agreement. David John Rowland was the sole representative for Inoco during those same negotiations. Braun Aff. Ex. RR at 392–93; Pl. Mem. at 4, 7.

**17.** When asked whether he understood the Settlement Agreement to release Nycal's claim of fraudulent inducement against Inoco, Mr. Lacey responded: "Completely and utterly ... [the Settlement Agreement] was bulletproof ... you couldn't have got daylight 'round it, absolutely." Braun Aff. Ex. B at 65; *see also id.* Ex. A at 148. Similarly, Mr. Rowland testified at a deposition that "[i]t was clear to my attorneys and it was clear to Lacey, it was clear to Nycal ... that it was [a] full and final release on everything." *Id.* Ex. D at 144.

**18.** Braun Aff. Ex. A at 87–88.

**19.** Braun Aff. Ex. D at 134.

**20.** *Id.*

**21.** *Id.*

**22.** Glen Decl. Ex. 1 at ¶ 14.

**23.** *Id.* at ¶¶ 16, 20.

**24.** *Id.* at ¶¶ 18, 20.

**25.** Pl. Mem. at 23–24 n.8.

**26.** Glen Decl. Ex. 9, Item 3.

"outlined the negotiations which had taken place between Inoco and Nycal regarding the outstanding payment of £360,000 due from Nycal in respect of their purchase of shares in Gulf Resources & Chemical Corporation. He also pointed out that following the other transactions set out above Inoco would be left with a holding of $580,-000 of Series B Preferred Stock. The board agreed that provided this holding in Nycal was redeemed for cash it would not be in Inoco's interests to pursue the litigation against Nycal in view of the likelihood that payment would not be received within a reasonable timescale."[27]

Nycal argues that the purported contrast between these two reports could lead a reasonable person to infer that the parties understood at the time that Inoco's settlement with Nycal was to be of a limited nature.[28]

Finally, Nycal points to the difference between the language used in the Nycal–Inoco release and the language used in releases given to Inoco by Gulf and City Realties Limited ("CRL") in contemporaneous and related settlement agreements. Whereas the Nycal–Inoco language releases claims "arising out of" the SPA, the releases executed by Gulf and CRL refer to "all claims ... liabilities, duties, debts, and obligations owed or alleged to be owed ... as [of] 30 September 1991 or in respect of any period ended on or prior to that date ..."[29] Nycal argues that the allegedly limited nature of the Settlement Agreement may be inferred from the contrasting language used in these releases.[30]

With this summary of the extrinsic evidence in mind, the next step is to determine the admissibility of that evidence.

### 1. Is Evidence of Uncommunicated Subjective Intent Admissible?

The purpose of contract interpretation, of course, is to determine the intentions of the parties.[31] Under New York law, this is accomplished by examining the objective manifestations of the parties' intentions.[32] In the words of Judge Learned Hand:

"[a] contract has, strictly speaking, nothing to do with the personal, or individual, intent of the parties. A contract is an obligation attached by the mere force of law to certain acts of the parties, usually words, which ordinarily accompany and represent a known intent."[33]

This exclusive reliance upon evidence of objective manifestations of intent renders evidence of uncommunicated subjective intent irrelevant, as demonstrated by the New York Court of Appeals' decision in *Wells v. Shearson Lehman/American Express:*[34]

"Plaintiff simply insists that her subjective intent not to release defendants creates an issue of fact that requires extrinsic evidence. But no manifestation of this alleged intent was made to anyone when the parties entered into the release. Uncommunicated subjective intent alone cannot create an issue of fact where otherwise there is none."[35]

27. *Id.,* Item 4.

28. Pl. Mem. at 23–24 n.8.

29. Braun Aff. Ex. L at 7, 22.

30. Pl. Mem. at 15.

31. *See, e.g., Chase Manhattan Bank v. First Marion Bank,* 437 F.2d 1040, 1048 (5th Cir.1971) (applying New York law); *William C. Atwater & Co. v. Panama Railroad Co.,* 246 N.Y. 519, 159 N.E. 418, 419 (1927).

32. *See, e.g., Hanson v. McCaw Cellular Communications, Inc.,* 881 F.Supp. 911, 916 (S.D.N.Y. 1995), *aff'd,* 77 F.3d 663 (2d Cir.1996) (contrasting New York with California law) (citing *Hotchkiss v. National City Bank of New York,* 200 F. 287, 293 (S.D.N.Y.1911), *aff'd,* 201 F. 664 (2d Cir.1912), *aff'd sub nom. National City Bank v.*

*Hotchkiss,* 231 U.S. 50, 34 S.Ct. 20, 58 L.Ed. 115 (1913); *Mencher v. Weiss,* 306 N.Y. 1, 7–8, 114 N.E.2d 177 (1953) ("[T]he manifestation of a party's intention rather than the actual or real intention is ordinarily controlling."); *see also Hanley v. Sevilla Restaurant & Bar,* No. 96 Civ. 3193(LAK), 1997 WL 30954, at *3 (S.D.N.Y. Jan.24, 1997) ("In determining the intention of the parties, it is the objective manifestations of their intent to one another that count, not their unexpressed subjective views.")

33. *Hotchkiss,* 200 F. at 293.

34. *Wells v. Shearson Lehman/American Exp.,* 72 N.Y.2d 11, 24, 530 N.Y.S.2d 517, 524, 526 N.E.2d 8, 14 (1988)

35. *Id.* 72 N.Y.2d at 24, 530 N.Y.S.2d at 524, 526 N.E.2d at 14.

Moreover, the Third Department recently applied *Wells* in affirming a trial court's refusal to admit extrinsic evidence of the uncommunicated subjective intent of the parties in a dispute over the interpretation of an ambiguous contract provision.[36] Thus, when resolving disputes concerning the meaning of ambiguous contract language, unexpressed subjective views have no proper bearing. Only the parties' objective manifestations of intent are considered.[37]

### 2. Evaluation of the Extrinsic Evidence

■ Applying the principles just discussed to the evidence offered by the parties, the only germane testimonial evidence is that of objective manifestations of the parties' intent.[38] Thus, the only testimonial evidence presented by either party that is properly considered is the testimony of Messrs. Lacey and Rowland concerning objective expressions of the parties' intent made during the negotiations. Significantly, this testimony unequivocally supports Inoco's interpretation of the release as a general one encompassing claims of fraudulent inducement.[39] The remainder of the testimonial evidence, including the rest of Lacey's and Rowland's testimony[40] and all of Mr. Horn's testimo-

---

**36.** *Sally v. Sally,* 225 A.D.2d 816, 638 N.Y.S.2d 832 (1996) (evidence of parties' uncommunicated subjective understanding of ambiguous language in contract is irrelevant); *see also Padovano v.. Vivian,* 217 A.D.2d 868, 869, 629 N.Y.S.2d 844, 846 (3d Dept.1995) (even if phrase "good working order" were ambiguous, "extrinsic evidence of the parties uncommunicated subjective intent would be irrelevant"); *Hudson–Port Ewen Assocs. v. Kuo,* 165 A.D.2d 301, 566 N.Y.S.2d 774, 777, *aff'd,* 78 N.Y.2d 944, 573 N.Y.S.2d 637, 578 N.E.2d 435 (1991) ("[i]n the absence of any evidence that the opposing views now advanced were either discussed or considered by the parties during the process leading up to the execution of the agreement, the words in the contract must be given the meaning which those to whom they are addressed would reasonably be expected to perceive.")

**37.** Despite the clarity of this rule, a few cases have used language which could be construed as suggesting that unexpressed subjective views might be considered in order to resolve ambiguity. In particular, *Walk–In Med. Center, Inc. v. Breuer Capital Corp.,* 818 F.2d 260 (2d Cir.1987), stated that "[e]vidence of the parties' subjective intent was ... properly admitted" in order to interpret the ambiguous language "adverse market conditions." *Id.* at 264. This language appears to be in conflict with the rule of objective interpretation articulated by Judge Hand in *Hotchkiss* and scrupulously adhered to by New York courts ever since. But close scrutiny indicates that *Walk–In* should not be given such a broad reading.

*Walk–In* relies primarily upon *Paragon Resources, Inc. v. National Fuel Gas Distribution Corp.,* 695 F.2d 991 (5th Cir.1983) (applying New York law), which stated that once a court deems a contract provision ambiguous, "other extrinsic evidence ... [including] oral statements of the parties as to what they intended" are then admissible. *Id.* at 996. But there is nothing in *Paragon* to suggest that it approved the use of uncommunicated expressions of subjective intent.

*Walk–In* relies also upon *Surlak v. Surlak,* 95 A.D.2d 371, 466 N.Y.S.2d 461, 466 (2d Dept.

1983). In dictum, *Surlak* quoted *Matter of Robinson v. Robinson,* 81 A.D.2d 1028, 1029, 440 N.Y.S.2d 127, 129 (4th Dept.1981), for the proposition that the construction placed on an ambiguous agreement by the parties would be relevant. 466 N.Y.S.2d at 466. *Robinson,* however, does not authorize the wholesale introduction of subjective evidence, but is instead limited to the unremarkable assertion that the subsequent conduct of the parties is admissible to interpret an ambiguous contract. 440 N.Y.S.2d at 129. Such evidence is a far cry from testimony concerning unexpressed personal understandings prohibited by *Hotchkiss* and its progeny. *Surlak* therefore does not support the language in *Walk–In* for which it is cited.

In the final analysis, the quoted sentence in *Walk–In,* to whatever extent it properly is read to approve reliance on uncommunicated expressions of subjective intent, is inconsistent with the overwhelming weight of authority.

**38.** *See Hanley v. Sevilla Restaurant & Bar,* No. 96 Civ. 3193(LAK), 1997 WL 30954, at *3 (S.D.N.Y. Jan.24, 1997); *Hanson v. McCaw Cellular Communications, Inc.,* 881 F.Supp. 911, 916 (S.D.N.Y.1995), *aff'd,* 77 F.3d 663 (2d Cir.1996); *Hotchkiss v. National City Bank of New York,* 200 F. 287, 293 (S.D.N.Y.1911), *aff'd,* 201 F. 664 (2d Cir.1912), *aff'd sub nom. National City Bank v. Hotchkiss,* 231 U.S. 50, 34 S.Ct. 20, 58 L.Ed. 115 (1913); *Wells v. Shearson Lehman/American Exp.,* 72 N.Y.2d 11, 24, 530 N.Y.S.2d 517, 524, 526 N.E.2d 8 (1988); *Mencher v. Weiss,* 306 N.Y. 1, 7–8, 114 N.E.2d 177 (1953); *Sally v. Sally,* 225 A.D.2d 816, 638 N.Y.S.2d 832 (3d Dept. 1996); *Padovano v. Vivian,* 217 A.D.2d 868, 869, 629 N.Y.S.2d 844, 846 (3d Dept.1995); *Hudson–Port Ewen Assocs. v. Kuo,* 165 A.D.2d 301, 566 N.Y.S.2d 774, 777, *aff'd,* 78 N.Y.2d 944, 573 N.Y.S.2d 637, 578 N.E.2d 435 (3d Dept.1991).

**39.** Braun Aff. Ex. A at 87–88; *Id.* Ex. D at 134.

**40.** *Id.* Ex. B at 65; *id.* Ex. A at 148; *id.* Ex. D. at 144.

ny,[41] reflects subjective intent or understanding only and therefore is not properly considered in construing the ambiguous language.[42]

Aside from the testimonial evidence, there are two other items of extrinsic evidence that must be discussed: the October 4, 1991 Inoco board meeting minutes [43] and the contemporaneous settlement agreements.[44] Nycal argues that these documents reveal the allegedly limited nature of the Nycal–Inoco Settlement Agreement.[45] This assertion does not withstand analysis.

The minutes of the October 4, 1991 Inoco board meeting fail to support Nycal's proposed interpretation. Nycal asserts that because the minutes covering Mr. Rowland's report on the Gulf negotiation made a reference to a "settlement of outstanding issues" but the minutes covering Mr. James' report on the Nycal negotiation made reference only to an outstanding debt, to an acquisition, and to Inoco's own litigation against Nycal, it follows that the release contained in the Settlement Agreement is limited to "(a) the litigation then pending between Nycal and Inoco over [the] check for £360,000 which had

formed part of the purchase price at the closing of the Stock Purchase Agreement and (b) the claimed breaches of the SPA in connection [with] the Gulf–Pac loan." [46.]

Nycal's argument is a non-sequitur. The use of the phrase "settlement of outstanding issues" in Mr. Rowland's report but not in Mr. James' report hardly indicates that Inoco understood the language "no further claims arising out of the Stock Purchase Agreement or the transactions contemplated thereby . . . as may now exist or as may arise after the date hereof" to include only the Gulf–Pac loan and the stopped-check issues. This is particularly true in light of the fact that Mr. James never adverted to the scope of the Nycal release in any manner at all. The two reports simply are not comparable on this point.

Nycal further argues that its interpretation of the Settlement Agreement is supported by differences in the language used in the release given by Nycal to Inoco, on the one hand, and in the releases given to Inoco by Gulf and CRL on the other.[47] The Nycal

41. Glen Decl. Ex. 1.

42. Mr. Horn's own testimony indicates that he never objectively manifested or communicated his own understanding of the nature of the release to Inoco. *Id.* at ¶¶ 18, 20.

The lack of any objective manifestation of Horn's viewpoint is not the only flaw in Nycal's reliance on his testimony, however. Horn's lack of personal knowledge concerning the parties' intent is similarly problematic. In *Alternative Thinking Systems, Inc. v. Simon & Schuster, Inc.,* 853 F.Supp. 791 (S.D.N.Y.1994), the failure of either party to come forward with an affidavit based on personal knowledge of the contract negotiations that would shed light on the parties' intent as to an ambiguous provision led the court to hold that a genuine issue of material fact as to the parties' intent remained. *Id.* at 798. Unlike either party in *Alternative Thinking,* Inoco has come forward with evidence grounded in personal knowledge, in the form of the Lacey and Rowland testimony. In contrast, Nycal has come forward with the testimony of a person who concededly has no personal knowledge of the negotiations concerning the scope of the release, and thus has failed to raise a genuine issue of material fact concerning the parties' intent. The Second Circuit's decision in *Burger King Corp. v. Horn & Hardart Co.,* 893 F.2d 525 (1990), is not to the contrary. In that case, the Circuit found that the extrinsic evidence offered by the parties to explain an ambiguous settle-

ment agreement was in conflict, raising a genuine issue of material fact. *Id.* at 528. The defendant had argued that its affiant's testimony should control because one of the plaintiff's two affiants did not have personal knowledge of the "major part of the negotiations concerning the Settlement Agreement." *Id.* at 528 n. 1. Of course, this argument failed to dispel the conflict between the two sides' affiants, since it did not foreclose the possibility that either of the plaintiff's two affiants did in fact have at least some personal knowledge of the parties' intentions. *Id.* The situation with the Horn testimony is different, however. Unlike the situation in *Burger King,* the possibility of personal knowledge is completely foreclosed.

43. Glen Decl. Ex. 9.

44. Braun Aff. Ex. L at 7, 22.

45. Pl. Mem. at 15, 23–24 n.8.

46. *Id.* at 22.

47. It is not clear that this argument, even if successful, would create a genuine issue of material fact in light of the unanimous and unrebutted testimony concerning the objective manifestations of the parties' intent. It is not necessary, however, to decide this issue, because the argument fails.

release referred to claims "arising out of" the SPA. The Gulf and CRL releases referred to "all claims ... liabilities, duties, debts, and obligations owed or alleged to be owed ... as [of] 30 September 1991 or in respect of any period ended on or prior to that date : .."

Nycal characterizes the difference between these releases as "striking" and reflective of the parties' intention to craft only a limited release between Nycal and Inoco.[48] The difference in language employed, however, simply does not support this conclusion. Any difference is a logical consequence of the different relationships and dealings between the respective companies. The relationship between Inoco and Nycal, unlike that between Inoco and Gulf and CRL, was limited to the SPA and matters arising therefrom. It is unremarkable, then, to find that the Nycal–Inoco language spoke specifically in terms of the SPA, whereas the other releases, drawn against the context of more extensive connections between the parties, spoke in less specific terms.

In any case, Nycal's argument on this point would prove too little. At most, it would demonstrate that something less than a general release was granted. But it would not follow from this that the language "arising out of the SPA" does not include a claim of fraudulent inducement of the SPA. In other words, however limited the Settlement Agreement release might be, at least some claims relating to the SPA necessarily were released; the contrast highlighted by Nycal does not suggest that claims of fraudulent inducement of the SPA are not within the group of precluded claims.

Nor is there any evidence supporting Nycal's far more restricted view that the Settlement Agreement was meant "only to resolve the Inoco suit on the stopped check, and Nycal's claims for breach of warranties and

representations in connection with the Gulf–Pac loan."[49] This exceedingly narrow interpretation does not square with the plain language of the release. More significantly, the Court previously has observed that "the fact that the Settlement Agreement disposed of a controversy in which plaintiff asserted a fraudulent inducement claim suggests that the waiver in that document is properly construed as reaching beyond claims for breach of contract."[50]

The Settlement Agreement disposed of more than the two discrete matters insisted upon by Nycal. It disposed also of at least one controversy involving a claim of fraudulent inducement. In light of the fact that the Settlement Agreement released "any such claim as may now exist or as may arise after the date hereof," it therefore follows that all fraudulent inducement claims concerning the SPA were released. Nycal has come forward with no admissible evidence supporting a contrary conclusion. The unrebutted extrinsic evidence of the parties' objective manifestations of intent thus leads inexorably to the conclusion that the Settlement Agreement released all claims relating to the SPA, including claims for fraudulent inducement.

## II. Fraudulent Inducement of the Settlement Agreement

Nycal seeks to avoid the Settlement Agreement's preclusive impact on its claim of fraudulent inducement into the SPA by asserting that the Settlement Agreement too was fraudulently induced. In support, Nycal claims that the Settlement Agreement "was the product of fraudulent misrepresentations and omissions, specifically the failure of Inoco to inform Nycal that Inoco had diverted NZ$5,000,000 of the purchase price of Unisys House, in New Zealand, from the seller Citi-

---

**48.** Pl. Mem. at 15.

**49.** *Id.* at 24.

**50.** *Nycal I*, 949 F.Supp. at 1121.
Furthermore, although Mr. Horn's subjective view of the scope of the release is not relevant, it is worth noting that his view is inconsistent with Nycal's strict interpretation. Mr. Horn apparently conceded in his deposition that more claims were encompassed by the Settlement

Agreement than just those relating strictly to the Gulf–Pac loan and the stopped check, when he said that "we basically were releasing the things that we knew about or had reason to question that we had particular problems with, one of which was obviously the Sexton trades." Braun Aff. Ex. RR at 365. The Sexton trades, according to Nycal's own pleadings in this and a related action, form the basis of a fraudulent inducement claim. *Id.* Ex. H at ¶¶ 8(c), 15–17.

bank to accounts used for Inoco's benefit at Interallianz Bank in Switzerland. [Also known as the 'New Zealand frauds.']" [51]

This claim previously was the subject of a motion to dismiss for failure to plead with particularity as required by FED.R.CIV.P. 9(b) .[52] In *Nycal II*, the Court held that Nycal adequately had pled its claim of fraudulent inducement into the Settlement Agreement in light of the specific allegations contained in Nycal's motion papers.[53] Those papers asserted that Nycal believed that it was aware of all "material frauds or other improprieties" at the time it entered into the Settlement Agreement in October 1991, but in fact was unaware of the so-called "New Zealand frauds" until March 1993.[54] Nycal asserts that it now has come forward with evidence in support of these allegations, in the form of Mr. Horn's declaration and that this renders summary judgment inappropriate.

▮ At first blush, the argument has some appeal. There has been an important development in this case since the motion to dismiss was considered, however. The Court has concluded that the Settlement Agreement extends to claims of fraudulent inducement. This presents a significant new problem for Nycal, because "a plaintiff who has settled a claim for fraud may not subsequently assert that he or she is not bound by the settlement because the extent of the fraud was not fully disclosed." [55]

The Second Circuit's decision in *Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*[56] is instructive. *Bellefonte* addressed an attempt by two companies to rescind their reinsurance contracts and settlement agreements with Argonaut on the ground that Argonaut had withheld material information concerning its relationship with a third company acting in Argonaut's name.[57] The plaintiffs argued that they could not be bound by the settlement of their fraud claims because the scope of the fraud had not been disclosed fully.[58] This argument was rejected by the Second Circuit as clearly contrary to the rule of *Alleghany Corp. v. Kirby*,[59] in which the Circuit refused to allow a corporation to escape the preclusive effect of its settlement of an earlier suit in which some, but not all, aspects of the underlying fraud had been revealed during the settlement's negotiation.[60] The *Bellefonte* plaintiffs attempted to distinguish *Alleghany*, but the Circuit concluded that the authorities upon which the plaintiffs relied

> "involved circumstances in which the settlement or release had been part of the very transaction attacked as fraudulently induced, or other circumstances in which it was *clear that no semblance of a fraud claim had come to light before the claim at issue was settled and it was clear that the parties had not intended to settle fraud claims.*" [61]

The Second Circuit invoked *Bellefonte* in *Finz v. Schlesinger*,[62] which addressed a plaintiff's claim that the release he had

---

**51.** Pl. Mem. at 5–6.

**52.** *Nycal II*, 968 F.Supp. 147.

**53.** *Id.* at 149.

**54.** Braun Aff. Ex. TT at 17–19.

**55.** *Finz v. Schlesinger*, 957 F.2d 78, 83 (2d Cir.), *cert. denied*, 506 U.S. 822, 113 S.Ct. 72, 121 L.Ed.2d 38 (1992), citing *Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*, 757 F.2d 523, 527 (2d Cir. 1985). *See also Alleghany Corp. v. Kirby*, 333 F.2d 327 (2d Cir.1964), *aff'd on rehearing*, 340 F.2d 311 (1965) (en banc; per curiam), *cert. dismissed*, 384 U.S. 28, 86 S.Ct. 1250, 16 L.Ed.2d 335 (1966); *Sotheby's, Inc. v. Dumba*, No. 90 Civ. 6458(KMW), 1992 WL 27043, *8–9 (S.D.N.Y. Jan.31, 1992) ("[B]ecause the release purports to absolve Sotheby's for any alleged misrepresentations, *when* Dumba discovered the alleged fraud

is irrelevant because a general release executed even without knowledge of a specific fraud effectively bars a claim or defense based on that fraud.") (emphasis added).

**56.** 757 F.2d 523.

**57.** *Id.* at 525.

**58.** *Id.* at 527.

**59.** 333 F.2d 327.

**60.** *Id. See Bellefonte*, 757 F.2d at 527.

**61.** *Bellefonte*, 757 F.2d at 528 (emphasis added).

**62.** 957 F.2d 78, 81 (2d Cir.), *cert. denied*, 506 U.S. 822, 113 S.Ct. 72, 121 L.Ed.2d 38 (1992).

signed was invalid due to the defendant's incomplete disclosure of material facts. The underlying dispute in *Finz* involved the plaintiff's belief that he was covered by his former law firm's pension plan, a point made problematic by the fact that he had signed a general release, for consideration, upon leaving that firm.[63] Subsequent to signing the release, Finz discovered the existence of certain facts relevant to the plan's coverage which he had suspected, but not known, at the time he signed the release.[64] Citing *Bellefonte*, the court held that "Finz, who at all times believed that defendants were misrepresenting his entitlement to benefits, should not be permitted to strike a better bargain at this late date by claiming that he signed the agreement in reliance on defendants' misrepresentations."[65]

*Tyson v. Cayton*[66] is a further example of the *Alleghany* rule, one with significant parallels to the present case. *Tyson* involved a dispute between the boxer Mike Tyson and his manager, William Cayton, in which Tyson sought rescission of their boxer-manager contract, alleging fraud.[67] This claim resulted in a lawsuit which subsequently was terminated by a settlement agreement.[68] Within months, however, Tyson filed a new suit, seeking to rescind the settlement agreement based on fraudulent inducement.[69] Tyson argued that Cayton had fraudulently concealed ten material facts which allegedly would have led him to reject the settlement agreement.[70] Cayton responded by invoking *Bellefonte*, to which Tyson rejoined that *Bellefonte* was distinguishable from his own situation in that *Bellefonte* did not involve a fiduciary relationship and the duty to disclose material facts attendant upon such a relationship.[71] In other words, Tyson argued that the *Alleghany* rule does not apply when the

settlement of a fraud claim involves fraud by a party with a duty of full disclosure, such as a fiduciary. The court had no difficulty in rejecting Tyson's attempted distinction in light of the fact that *Alleghany* itself involved directors with fiduciary duties.[72]

The analogy to Nycal's complaint is apparent in each of these cases. *Alleghany, Bellefonte,* and their progeny compel the conclusion that Nycal cannot avoid the preclusive impact of the Settlement Agreement. Only if the Court had held that the Settlement Agreement did not encompass claims of fraudulent inducement would Nycal have been able to attack the Settlement Agreement itself on the ground that it too was induced by fraud. Since the Court holds that the release does cover claims of fraudulent inducement, however, the *Alleghany* rule is applicable. A party that settles a claim of fraudulent inducement cannot revisit that settlement by asserting that the alleged defrauding party did not make a full disclosure of its own fraud. This is so even if the defrauding party has an independent duty to disclose,[73] and even when the release was executed without knowledge of certain specific frauds.[74] Nycal therefore is precluded from seeking rescission of the Settlement Agreement on the ground that Inoco did not fully disclose all of its alleged frauds.

Nycal's attempts to avoid the impact of the *Alleghany* rule are unpersuasive. Among the arguments plaintiff presents is the suggestion that the Second Circuit incorrectly decided *Bellefonte*, and presumably *Alleghany* and *Finz* as well, as a matter of "hornbook law" and that these precedents no longer have "any continuing vitality."[75] Nycal apparently suggests that *Bellefonte* is in ten-

63. *Id.* at 80–81.

64. *Id.* at 80.

65. *Id.* at 83.

66. 784 F.Supp. 69 (S.D.N.Y.1992).

67. *Id.* at 71.

68. *Id.*

69. *Id.* at 73–74.

70. *Id.*

71. *Id.* at 74.

72. *Id.* at 74–75.

73. *See, e.g., id.*

74. *See, e.g., Sotheby's,* 1992 WL 27043, *7.

75. Pl. Mem. at 9.

sion with the unremarkable principal that fraud in the inducement generally makes ·a contract voidable.[76] There is no such tension. The authorities on which Nycal relies to establish this conflict neither address the *Alleghany–Bellefonte* line nor the scenario in which a release is given in the context of existing claims of fraud and thus are of no consequence to this motion.[77]

Finally, Nycal seeks to prevent summary judgment on this issue by arguing that "the concealed [New Zealand] fraud was a different *kind* of fraud from that which [Nycal] knew Rowland and Inoco was engaged in." [78] As Nycal puts it, this particular fraud allegedly destroyed the accuracy of the financial information concerning CRL, and thus Gulf, in a manner that other frauds did not .[79] Nycal offers no authority whatsoever in support of its proposition that this alleged difference-in-kind exempts this particular fraud from the otherwise-preclusive effect of the *Bellefonte* rule. Most likely, the failure to address *Bellefonte* results from the fact that Nycal intended this argument to rebut Inoco's argument that there was no justifiable reliance in this case.[80] Regardless of its purpose, however, the "distinction" highlighted by Nycal presents no reasoned basis for departing from the *Bellefonte* rule. Nycal therefore is precluded from asserting that it was fraudulently induced to enter the Settlement Agreement by Inoco's alleged failure to disclose fully the extent of its alleged frauds during negotiation of the Settlement Agreement.

**76.** *See, e.g., Allen v. WestPoint–Pepperell, Inc.*, 954 F.Supp. 682, 694 (Ṡ.D.N.Y.1997) (plaintiffs released claims concerning their right to a certain interest rate in return for a different interest rate; these releases could not preclude a subsequent action alleging misrepresentation or fraud.)

**77.** Strikingly, at one point in its papers, Nycal explicitly acknowledges the infirmity of its argument on this point, when it concedes, in the context of "rebutting" Inoco's argument that there was no justifiable reliance, that "one can not rely on a failure to reveal fraud by a known fraudster in entering into a contract, and then seek to disavow the contract because there was, in fact, underlying fraud. While *Nycal does not disagree with the proposition,* it doesn't apply to

*Conclusion*

For the foreigoing reasons, the defendants' motion for summary judgment dismissing the complaint is granted.

SO ORDERED.

the present case." Pl. Mem. at 10 (emphasis added).

**78.** *Id.* at 11.

**79.** *Id.*

**80.** Both parties have spent considerable energy discussing whether there was any duty to disclose in this situation. As *Alleghany* and *Tyson* make clear in the context of fiduciary duties and their attendant duties to disclose, the *Alleghany–Bellefonte* rule does not contain any exception for a party to whom a full disclosure is owed. *Alleghany*, 333 F.2d at 333; *Tyson*, 784 F.Supp. at 74–75. Thus, it is not necessary to consider whether such a duty existed here and, if so, whether it was violated.