174 F.3d 65
 Pens. Plan Guide (CCH) P 23,952
Harold E. SHEPLEY, Jr., Richard A. Kimmel, Gary L. Miller,
Elmer C. Beeman, Jr., Mark E. Deflori and Dorothy
B. Marker, and a class of all others
similarly situated, Plaintiffs-Appellees,
v.
NEW COLEMAN HOLDINGS INC., formerly known as The Coleman
Company, Inc., Glen P. Dickes, Donald G. Drapkin, William J.
Fox, Howard Gittis, Richard E. Halpern, Frederick W. McNabb,
Jr., Ronald O. Perelman, Bruce Slovin, Fred L. Tepperman,
Carl T. Tsang, Warren B. Armstrong, Kenneth J. Wagnon,
Richard D. Smith, MacAndrews Acquisition (Kansas), Inc.,
MacAndrews & Forbes Holdings, Inc., Jay Davis, Jeffrey
Curtis and Timothy P. Cotter, Defendants-Appellants.
 No. 818, Docket No. 98-7519.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 11, 1998.
Decided April 1, 1999.
 
 David B. Rodes, Pittsburgh, PA (John T. Tierney, III, Goldberg, Persky, Jennings & White, P.C., Pittsburgh, PA, on the brief; Richard M. Seltzer, Jani K. Rachelson, Joseph J. Vitale, Cohen, Weiss and Simon, New York, NY, of counsel), for Plaintiffs-Appellees.
 Lewis R. Clayton, New York, N.Y. (Robert S. Smith, Robert N. Kravitz, Sherrie L. Russell-Brown, Paul, Weiss, Rifkind, Wharton & Garrison, on the brief), for Defendants-Appellants.
 (Lauren M. Bloom, Thomas C. Griffin, American Academy of Actuaries, Washington, DC; Michael W. Mitchell, Morvillo, Abramowitz, Grand, Iason, Silberberg, P.C., New York, NY, on the brief), for Amici Curiae American Academy of Actuaries and American Society of Pension Actuaries.
 (Mary Ellen Signorille, AARP Foundation Litigation; Melvin Radowitz, American Association of Retired Persons, Washington, DC, on the brief), for Amicus Curiae American Association of Retired Persons.
 (Joel Field, White Plains, NY, on the brief), for Amicus Curiae United Steelworkers of America, AFL-CIO.
 Before: WINTER, Chief Judge, and JACOBS and POOLER, Circuit Judges.
 JACOBS, Circuit Judge:
 
 
 1
 The successor corporation to The Coleman Company, Inc. and other corporate and individual defendants ("Coleman") appeal from the October 10, 1997 order of the United States District Court for the Southern District of New York (Batts, J.) granting partial summary judgment to participants in Coleman's defined benefit pension plan and declaring that the participants (Coleman's former employees) are entitled to the surplus assets in the plan--a total of $13,895,380, plus interest. (Coleman also appeals from the January 12, 1998 order denying reconsideration of that ruling.)
 
 
 2
 We reverse.
 
 BACKGROUND
 
 3
 From May 9, 1955 until June 30, 1989, Coleman operated The Coleman Company, Inc. Pension Plan for Weekly Salaried and Hourly Paid Employees ("the Plan"), an employee benefit plan under section 3(3) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1002(3) (1994), that was subject to coverage under section 4(a) of ERISA, 29 U.S.C. § 1003(a). The Plan is a defined benefit plan because it predetermines the level of benefits to which participating employees will ultimately be entitled. See Brillinger v. General Elec. Co., 130 F.3d 61, 62 (2d Cir.1997), cert. denied, --- U.S. ----, 119 S.Ct. 1025, 143 L.Ed.2d 37 (1999). All fund contributions were made by Coleman,[1] and were then used to pay out current benefits or invested to provide benefits in the future.[2] The amounts of Coleman's contributions were based upon actuarial calculations of future benefit payments and rates of return for Plan investments.
 
 
 4
 Coleman terminated the Plan as of June 30, 1989. After satisfaction of all Plan liabilities to its participants and their beneficiaries, a surplus of $13,895,380 remained. Those residual assets are at stake in this case.
 
 
 5
 A group of former Plan participants brought this lawsuit, alleging that reversion of the remaining assets to Coleman would constitute (inter alia ) a violation of ERISA, 29 U.S.C. § 1344(d)(1)(C). Coleman answered that it was entitled to the surplus assets under both ERISA and the terms of the Plan. Upon cross-motions for summary judgment, the district court granted partial summary judgment in favor of the participants on their first claim for relief and dismissed the participants' remaining claims. The district court then certified the case for immediate appeal, see 28 U.S.C. § 1292(b). Coleman now appeals.
 
 DISCUSSION
 
 6
 We review the district court's grant of summary judgment de novo. See Young v. County of Fulton, 160 F.3d 899, 902 (2d Cir.1998). In doing so, we construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); Maguire v. Citicorp Retail Servs., Inc., 147 F.3d 232, 235 (2d Cir.1998).
 
 
 7
 * ERISA distinguishes between two types of employee pension plans: "defined benefit plans" (like Coleman's), and "individual account plans" (also known as "defined contribution plans"). 29 U.S.C. § 1002(34)-(35).
 
 
 8
 In an individual account plan, the employer and employees contribute to individual employee accounts; each employee's retirement benefit is based upon the contributions, gains, losses, and expenses attributable to the account of that employee. See 29 U.S.C. § 1002(34). "[U]nder such plans, by definition, there can never be an insufficiency of funds in the plan to cover promised benefits, since each beneficiary is entitled to whatever assets are dedicated to his individual account." Hughes Aircraft Co. v. Jacobson, --- U.S. ----, ----, 119 S.Ct. 755, 761, 142 L.Ed.2d 881, ---- (1999) (citation and internal quotation marks omitted).
 
 
 9
 In a defined benefit plan, the employer contributes assets into a pool of funds from which predetermined benefits are paid.[3] See Brillinger, 130 F.3d at 62. "[T]he employee, upon retirement, is entitled to a fixed periodic payment regardless of the performance of the plan's assets." Id. (citation omitted). To estimate the contributions required over time to yield those fixed payments, employers retain the services of an actuary to make calculations about various factors, "including (1) the rate of return on the investment of plan assets over the life of the plan; (2) the date that the payment of benefits will commence; (3) administrative expenses that the plan will incur; and (4) the period of time during which benefits will be paid." Wachtell, Lipton, Rosen & Katz v. Commissioner, 26 F.3d 291, 293 (2d Cir.1994). However careful and prescient the actuary, these calculations can only approximate the amount of benefits ultimately required; therefore,
 
 
 10
 [i]f unsuccessful investment of the plan assets impairs the plan's ability to make up the scheduled payments from the plan assets, the employer must nonetheless make up any deficiency from its own assets. By the same token, if the investment of plan assets is successful and produces a surplus, the employer benefits.
 
 
 11
 Brillinger, 130 F.3d at 62 (citation omitted) (emphasis added). "Since a decline in the value of a [defined benefit] plan's assets does not alter accrued benefits, [participants] similarly have no entitlement to share in a plan's surplus--even if it is partially attributable to the investment growth of their contributions." Hughes Aircraft Co., --- U.S. at ---- - ----, 119 S.Ct. at 761-62.II
 
 
 12
 Although participants in a defined benefit plan lack any presumptive entitlement to surplus assets, employers also lack any such entitlement unless the plan provides for an employer distribution. Under ERISA, the residual assets of an employee benefit plan can be distributed to an employer only when three conditions have been fulfilled: "(A) all liabilities of the plan to participants and their beneficiaries have been satisfied, (B) the distribution does not contravene any provision of law, and (C) the plan provides for such a distribution in these circumstances." 29 U.S.C. § 1344(d)(1). There is no dispute here that the first two conditions have been met: the Plan's liabilities were satisfied, and distribution to Coleman would not be unlawful. The question is whether the Plan provided for distribution of the remaining assets to Coleman.
 
 
 13
 The relevant provisions are contained in two documents--a 1977 Trust Agreement (established to implement the original 1955 Plan's provisions) and a 1984 amended restatement of the original Plan ("the 1984 Plan" or "the Plan"). Section 15.2 of the 1977 Trust Agreement states that Coleman "shall have no beneficial interest in the Trust Fund either during its continuance or upon termination of this Trust, except as otherwise provided in the Plan." (Emphasis added.) The Plan does otherwise provide. Section 11.5(d)(2) of the 1984 Plan states that upon termination, the Company may take any surplus:
 
 
 14
 (d) If, after the full equity of each Class has been set aside from the Trust Fund, there is any balance remaining in the Trust Fund, the Trustee shall dispose of such balance as follows:
 
 
 15
 ....
 
 
 16
 (2) If the Plan is being discontinued as to all Employees, the Trustee shall dispose of such balance as the Company may direct. In the event of a Change in Control, the Company's directions shall conform to the requirements of Section 11.6.
 
 
 17
 The only stated limitation (a specified change in corporate control) requires the Trustee to distribute any surplus pro rata among the Plan participants and beneficiaries.
 
 
 18
 In holding that the Plan does not confer on Coleman the power to direct self-payment of any surplus upon the termination and winding up of the Plan, the district court relied on Section 9.2(c) of the 1984 Plan, which it read as not fully compatible with Section 11.5(d)(2); although Section 9.2(c) confers on Coleman a power to order reversion to itself of "any funds remaining in the Trust Fund" upon termination, such funds remaining are subject to the qualifying phrase "as a result of overpayment." The passage reads:
 
 
 19
 (c) Irrevocability. The Company and any Adopting Employer shall have no right, title, or interest in the contributions made by it to the Trustee or Trustees, and, except as permitted by Section 15.4, no part of the Trust Fund shall revert to the Company or any Adopting Employer, except that after satisfaction of all liabilities of the Plan, any funds remaining in the Trust Fund as a result of overpayment may revert to the Company or Adopting Employer. In the event of a Change in Control, such reversion shall not take place and the provisions of Section 11 shall apply.
 
 
 20
 (Emphasis added.)
 
 
 21
 The district court found that these provisions created an ambiguity (resolved by the court against Coleman): "one paragraph [Section 11.5(d)(2) of the 1984 Plan] provides for a determination by the Company regarding the remaining funds while the other sections [Section 15.2 of the 1977 Trust Agreement and Section 9.2(c) of the 1984 Plan] provide for reversion only of overpayment." "Resolution" of this ambiguity, the district court reasoned, "turns on the word 'overpayment' " in Section 9.2(c). The district court defined the word as "payment in excess of what is due" (citing Webster's Third New International Dictionary (1986)) and found "that a return on an investment does not constitute an 'overpayment.' " Because "the surplus assets in the Plan resulted from a high return on monies invested in the Plan, not from excess money contributed to the fund," the district court concluded that the surplus did not result from "overpayment," and therefore that Coleman was not entitled to the surplus. Applying the principle of contra proferentem, the district court construed any ambiguity it could not otherwise resolve against Coleman and declared that the participants are entitled to the Plan's surplus.
 
 III
 
 22
 We agree with the district court that resolution of this case rests on the meaning of the word "overpayment": upon termination of the Trust, the Plan confers on Coleman a "beneficial interest" in "any funds remaining in the Trust as a result of overpayment." We disagree, however, with the district court's conclusion that the qualifying phrase creates an ambiguity. "A word or phrase is ambiguous when it is capable of more than a single meaning 'when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.' " United Nat'l Ins. Co. v. Waterfront N.Y. Realty Corp., 994 F.2d 105, 107 (2d Cir.1993) (quoting Garza v. Marine Transp. Lines, Inc., 861 F.2d 23, 27 (2d Cir.1988) (citation omitted)). "Courts may not create an ambiguity where none exists." Id. at 108 (quoting Ingersoll Milling Mach. Co. v. M/V Bodena, 829 F.2d 293, 306 (2d Cir.1987)) (internal quotation marks omitted). We conclude that the other terms of the Plan, and its purpose and design, sufficiently fix the meaning and that the word "overpayment" in Section 9.2(c) of the Plan means the overage of the Plan assets (those contributed by Coleman, and any corresponding investment returns) net of plan liabilities (including the funding of vested pension obligations) at the time the Plan is terminated.
 
 
 23
 The question in this case is whether (as the district court held) the fact of overpayment is determined by reference to the actuarially established schedule of payments, and the amount of overpayment is any erroneous contribution in excess of that amount; or whether (as we conclude) the fact and amount of overpayment are determined by reference to the surplus of assets available to fund the Plan's liabilities when the Plan is terminated.
 
 
 24
 Like the district court, the participants define overpayment as "payment in excess of the actuarial amount due." Essentially, they argue, if Coleman contributes only the amounts that the actuary estimates will cover future benefits, there is no overpayment even if those amounts, augmented by investment returns, prove to be greater than needed to fund benefits and other liabilities. According to plaintiffs, Coleman can be deemed to have overpaid (and, by the terms of the Plan, be entitled to that portion of the surplus) only if Coleman's periodic payments exceeded the amounts specified in those actuarial estimates.
 
 
 25
 This view of overpayment rests on a misunderstanding of the fundamental nature of defined benefit plans. As the Supreme Court recently stated, the participants in a defined benefit plan "have no entitlement to share in a plan's surplus." Hughes Aircraft Co., --- U.S. at ----, 119 S.Ct. at 761. Because employers rely upon multi-variable actuarial estimates in determining the amount to contribute to their plans, see Wachtell, Lipton, Rosen & Katz, 26 F.3d at 293-94, it is inevitable that their contributions (plus any investment returns) will ultimately prove to be either more or less than required. See Hughes Aircraft Co., --- U.S. at ----, 119 S.Ct. at 761; Brillinger, 130 F.3d at 62. But the fact of a surplus or deficit, and its amount, can only be determined by hindsight.
 
 
 26
 The district court relied in part[4] on the somewhat tautological definition of the compound word "overpayment" in Webster's Third New International Dictionary--"payment in excess of what is due"--without consulting the definitions of the constituent word "payment." Among the meanings of "payment" is "the discharge of a debt or an obligation." Webster's Third New International Dictionary. Although Coleman had obligated itself to make periodic contributions to fund the Plan, Coleman's obligations to the participants were not "discharge[d]" until all benefits had been paid (because Coleman would have had to make good any deficiency in Plan assets, see Brillinger, 130 F.3d at 62). Therefore, the fact of overpayment can only be determined upon termination of the Plan, when Coleman can determine whether it discharged its obligation "in excess of what is due," and the amount of any such overpayment must be the overage of assets net of Plan liabilities.
 
 
 27
 Our reading of "overpayment"--which obviates the ambiguity on which the district court relied--is confirmed elsewhere in those parts of the Plan that address changes in corporate control, and which are geared evidently to inhibit an acquirer in some circumstances from using a Plan surplus to finance a takeover. The relevant provisions reference the termination of the Plan and describe the kind of computation that would be entailed in that event--the very calculation that would be made if the "overpayment" contemplated in Section 9.2(c) is (as we hold) the overage of assets net of pension obligations and other liabilities:
 
 
 28
 10.3 Change in Control. Notwithstanding the preceding provision of this Section 10 or any other provisions of this Plan, in the event of any such merger, consolidation, or transfer of assets or liabilities which is effected within three years following a Change in Control, the Accrued Benefit of each Participant and Beneficiary, ... shall be increased as set out in Section 11.6 such that any excess, as of the date of any such transaction, of the fair market value of the assets of the Plan over the present value of all accrued benefits hereunder (determined as if the Plan had terminated immediately prior to such transaction) is exhausted.
 
 
 29
 (Emphasis added.)
 
 
 30
 It is very difficult to understand why that calculation would be done in the event that "the Plan ... terminate[s]" except to calculate the amount of surplus available for distribution to someone. If (as the district court and the participants believe) the provisions they cite direct the surplus to Plan participants and beneficiaries, it would be unnecessary to provide specially for the channeling of surplus to Plan participants and beneficiaries in the event of a "Change in Control." But that is exactly what the Plan does:
 
 
 31
 11.6 Change in Control; Termination. Notwithstanding the preceding provisions of this Section 11 or any other provision of the Plan, in the event this Plan is terminated within three years following a Change in Control, the assets of the Plan shall be applied in accordance with the preceding provisions of this Section 11 to satisfy all liabilities to Participants and Beneficiaries. If, after satisfaction of such liabilities, there are assets remaining in the Plan, such assets shall be applied on a pro rata basis to increase the benefits of such Participants and Beneficiaries ....
 
 
 32
 (Emphasis added.)
 
 
 33
 The participants posit one final question: if, in Section 9.2(c), the word "overpayment" means overage of assets net of liabilities, and the surrounding text seemingly already permits reversion to the company of "any funds remaining" "after satisfaction of all liabilities of the Plan," what is the limiting effect of the phrase "as a result of overpayment"? After all, an interpretation of a contract that affords "a reasonable and effective meaning to all the terms of a contract is generally preferred to one that leaves a part unreasonable or of no effect." Rothenberg v. Lincoln Farm Camp, Inc., 755 F.2d 1017, 1019 (2d Cir.1985).[5] The answer is apparent in the text of the Plan.
 
 
 34
 The procedure for distributing Plan assets at discontinuance is set forth in Section 11.5. If the discontinuance is as to all employees, then (in a nutshell) the actuarial value of the total accrued benefits of various classes of employees and pensioners is calculated, and assets of the trust fund sufficient to fund those benefits are "set aside" for each class. The Plan's Retirement Committee has discretion to use the funds set aside in this manner for the benefit of each class by either purchasing annuity contracts, making the pension payments from the funds, or providing a lump-sum cash distribution. Section 11.5(d)(2) provides that if "after the full equity of each Class has been set aside from the Trust Fund, there is any balance remaining in the Trust Fund," the Trustee may dispose "of such balance as the Company may direct." This mechanism does not contemplate that the amounts set aside to fund benefits, including possible periodic payments over the life of the beneficiaries, are outside the trust fund; rather, they are cordoned off within it.
 
 
 35
 The disputed Section 9.2(c) should be read in light of this setting aside of assets. "[A]fter satisfaction of all liabilities of the Plan" in the manner more specifically described in Section 11.5, the Trust Fund very likely could contain two types of assets:
 
 
 36
 (i) amounts set aside for the funding of benefits, i.e., the Plan's liabilities;[6] and
 
 
 37
 (ii) amounts representing the overage of Plan assets net of those liabilities, i.e., funds remaining "as a result of overpayment."
 
 
 38
 Only the latter amounts can properly be deemed surplus to which Coleman is entitled. The sensible proviso in Section 9.2(c), allowing reversion to the Company only of "any funds remaining in the Trust Fund as a result of overpayment," is perfectly consistent with the idea that Coleman may direct to itself the full surplus assets of the Plan.
 
 CONCLUSION
 
 39
 We conclude that Coleman is entitled to the surplus assets under ERISA and the terms of the Plan. Accordingly, we reverse the district court's October 10, 1997 and January 12, 1998 orders, and remand to the district court with directions to enter summary judgment in favor of Coleman.
 
 
 
 [1]
 Section 9.2(b) of the Plan provides for contributions as follows:
 (b) Contributions.
 (1) No Employee shall be required or allowed to make any contributions to the Plan.
 (2) The Company shall make contributions from time to time during the continuance of the Plan to the Trust Fund. The Company expects to make sufficient contributions to provide the benefits specified in the Plan.
 (3) Forfeitures arising under this Plan because of termination of employment before a Participant becomes eligible for vesting, or for any other reason, shall be applied to reduce the cost of the Plan and not to increase the benefits otherwise payable to Participants.
 
 
 [2]
 Section 4 of the Plan provides benefit schedules for a variety of retirement circumstances (normal, early, disability, etc.)
 
 
 [3]
 Defined benefit plans may allow for employer-only contributions, employee-only contributions, or a combination of the two. See 29 U.S.C. § 1054(c). However, Coleman's Plan is funded by the employer only
 
 
 [4]
 The district court also relied in part on our opinion in Frank L. Ciminelli Constr. Co. v. Buffalo Laborers Supplemental Unemployment Benefit Fund, 976 F.2d 834 (2d Cir.1992). In Ciminelli, there had been a payment in excess of the predetermined periodic contribution (which the opinion calls an "overpayment" passim ), and recovery was barred as untimely under ERISA § 403(c)(2)(A)(ii), 29 U.S.C. § 1103(c)(2)(A)(ii), which limits the period in which an employer may bring an action for the recovery of such overpayments. See id. at 835-37. The word "overpayment" is not an ERISA term of art, however, and its use in Ciminelli does not fix or limit the meaning of that word in the Coleman Plan
 
 
 [5]
 This does not mean that summary judgment is only appropriate where such meaning can be afforded to all terms of a contract. The relevant inquiry in deciding a motion for summary judgment is whether "there is no genuine issue as to any material fact," Fed.R.Civ.P. 56(c), "a situation that obtains not only when the language is unambiguous, but also when the language is ambiguous and there is relevant extrinsic evidence, but the extrinsic evidence creates no genuine issue of material fact and permits interpretation of the agreement as a matter of law," Nycal Corp. v. Inoco PLC, 988 F.Supp. 296, 299 & nn.9-11 (S.D.N.Y.1997), aff'd, 166 F.3d 1201 (2d Cir.1998)
 
 
 [6]
 Even if all accrued benefits had been paid out of Plan assets, amounts would have to be set aside in the trust fund sufficient to cover any contingent liabilities of the Plan