**CIBC WORLD MARKETS CORP., Plaintiff,**

v.

**TECHTRADER, INC., Defendant.**

**No. 00 Civ. 7359(NRB).**

United States District Court, S.D. New York.

Sept. 28, 2001.

Lynn E. Judell, Rosenthal, Judell & Uchima, New York City, for plaintiff.

John C. Re, Aronauer, Goldfard, Sills & Re, New York City, for defendant.

## MEMORANDUM AND ORDER

BUCHWALD, District Judge.

Lynn E. Judell, Rosenthal, Judell & Uchima, New York City, for Plaintiff.

John C. Re, Aronauer, Goldfard, Sills & Re, New York City, for Defendant.

Plaintiff CIBC World Markets Corp. ("CIBC" or "plaintiff") brings this action for breach of contract against TechTrader, Inc. ("TT" or "defendant"). Currently before the court is CIBC's motion for summary judgment. For the reasons that follow, CIBC's motion is granted.

## I. BACKGROUND

### A. The Parties

TT is a startup company that provides software to create and maintain on-line business-to-business marketplaces. Affidavit of TT's Founder and Chairman of the Board, Jacob Pechenik ("Pechenik Aff.") at ¶ 3. In late 1999, defendant sought additional financing with the assistance of plaintiff, an investment bank that offers institutional investment banking services to a variety of domestic and international companies. Pechenik Aff. at ¶ 8; Affidavit of Director of CIBC World Markets Corp., Robert Lubin ("Lubin Aff.") at ¶ 2. On January 20, 2000, the parties executed an agreement (Def.'s Ex. B, henceforth, the "Final Agreement") pursuant to which TT retained CIBC as its exclusive financial advisor in connection with a possible sale or merger and acquisition of TT. Def.'s Rule 56.1 Statement at ¶ 1.

### B. The Agreement

CIBC brings this action to recover a fee pursuant to the Final Agreement, which provided for the following engagement:

This letter agreement confirms our understanding of the engagement of CIBC World Markets Corp. ("CIBC World Markets") by TechTrader, Inc. (together with its subsidiaries and affiliates, the "Company") to act as exclusive financial advisor to the Company in connection with a possible sale or other transfer, directly or indirectly and whether in one or a series of transactions, of all or a significant portion of the assets or securities of the Company or any extraordinary corporate transaction involving a change in control of the Company, regardless of the form or structure of such transaction (the "Transaction"); provided, however, that any bridge financing from the existing investors in the Company shall not be deemed a Transaction.

Def.'s Ex. B.

Furthermore, the Agreement provided for the payment of a transaction fee:

In connection with this engagement, the Company [TT] agrees to pay us [CIBC] (a) an agreement fee equal to the greater of $250,000 or 0.5% of the Transaction Value (as defined below), payable in cash upon the earlier of the close of a Transaction or termination of an agreement for a Transaction, plus (b) *a transaction fee equal to the greater of* $750,000 or 1.5% of the Transaction Value (as defined below), payable in cash on the closing date of a Transaction *if, during the term of this engagement or within six (6) months thereafter, a Transaction is consummated or an agreement is*

*entered into that subsequently results in a Transaction.*

Final Agreement at 2 (emphasis supplied).

Thus, the sole issue in this litigation is whether the venture capital investment received by TT in June of 2000 (the "Series–B Investment" [1]) triggered plaintiff's obligation, pursuant to the Final Agreement, to pay the demanded fee. To resolve that question we must determine whether the Series–B Investment is a "Transaction" as defined in the Final Agreement. If so, TT is obliged to pay CIBC the contemplated transaction fee.

## C. The Series–B Agreement

On June 12, 2000, TT accepted venture capital financing from Vistaar, Jackpot Enterprises (which has been renamed "J. Net"), First Chicago Equity Corp. ("First Chicago"), and Cross Creek Partners Xa, LLC ("Cross Creek") (collectively, the "Series–B Investors"), whereby these companies invested approximately 19 million dollars in exchange for Series–B Preferred Stock. Def.'s Ex. F ("Series–B Securities Purchase Agreement"); Pechenik Aff. at ¶ 25. None of the Series–B Investors were located or introduced to TT by CIBC. Pechenik Aff. at ¶ 26.

As a result of the Series–B Investment, the distribution of TT's shares and the composition of TT's Board of Directors were altered. The following tables summarize the ownership of TT shares before and after the completion of the Series–B Investment. Pl.'s Mem. in Support of Mot. for Summ. J. ("Pl.'s Mem.") at 10.

### Ownership of TT as of 5/31/2000
(Total Shares Stated in Common Equivalents)

| Owner | Total Shares | Percent Ownership |
|---|---|---|
| Jacob Pechenik | 5,250,000 | 45.89% |
| Stock Option Pool | 2,186,133 | 19.11% |
| Series–A Investors | 3,813,349 | 33.33% |
| Banking Warrants | 190,863 | 1.67% |

### Ownership of TT Post 6/12/00 Purchase Agreement
(Total Shares Stated in Common Equivalents)

| Owner | Total Shares [2] | Percent Ownership |
|---|---|---|
| J. Net | 5,185,094 | 26.37% |
| Vistaar | 5,185,094 | 26.37% |
| First Chicago | 1,652,749 | 8.4% |
| Cross Creek | *291,663* | *1.49%* |
| **Total: Series–B Investors** | **12,314,600** | **62.63%** |
| Jacob Pechenik | 4,323,487 | 21.99% |
| Stock Option Pool | 2,014,218 | 10.25% |
| Series–A Investors | 816,993 | 4.14% |
| Bank Warrants | 190,863 | .97% |

Prior to the Series–B Agreement, TT had entered into a voting agreement with the Series–A Investors (Def.'s Ex. H, "Voting Agreement"). This Voting Agreement provided that TT's seven-member Board of Directors was to be allocated as follows: Two directors were appointed by the Series–A investors, two were designated by the holders of a majority of the outstanding shares of Common Stock, one was the CEO of TT, and two were to be industry representatives not affiliated with TT or any investor. Pl.'s Mem. at 12; Voting Agreement at 2. This Voting

1. This particular round of venture capital investment is referred to as the Series–B Investment, and the investors as the Series–B Investors, because it is the second round of financing that TT has obtained. Pechenik Aff. at 25. TT's first round of venture capital financing was referred to as the Series–A Investment and the Series–A Investors received Series–A Preferred Stock. *Id.* at ¶ 5. See Part I.C., infra.

2. Total shares includes series B warrants convertible into shares. *Pl.'s Mem. at 10.*

Agreement did not survive the Series–B Agreement, which provides:

> Effective as of the Closing, the authorized size of the Board of Directors shall be seven (7) members and shall consist of (a) two individuals designated by Vistaar; (b) two (2) individuals designated by J. Net; (c) two (2) individuals who are designated by the holders of a majority of the outstanding shares of Common Stock; and (d) one (1) individual who is not an officer or employee of the Company and who is designated by the unanimous vote of the six (6) other members of the Board of Directors.

*Id.* at 12–13.

As a protection against the J. Net and Vistaar Board Members, Section 5(d) of the Certificate of Designation, Rights, and Preferences of Series–B Convertible Preferred Stock of TechTrader, Inc. ("Designation of Rights") requires that in any related-party transaction that would benefit the Series–B Investors, a vote of 85% of the Board of Directors must favor the transaction. Pechenik Aff. at ¶ 41. Such a vote could be obtained only if, in addition to the two J. Net Board Members and the two Vistaar Board Members, one or both of the Board Members appointed by the holders of Common Stock agreed to the transaction. *Id.*

After the closing of the Series–B Agreement, Jacob Pechenik remained the President and CEO of TT, David Roodberg remained the Chief Operating Officer, and Greg Campbell remained the Chief Technology Officer. Pechenik Aff. at ¶ 44. However, in November of 2000, five months after the closing, Mr. Pechenik stepped down as President and CEO, although he retained his position as Chairman of the Board of Directors and adopted the new title of Chief Strategy Officer. Pechenik Aff. at 16 n. 1. Mr. Pechenik was succeeded as CEO by Matthew Suffoletto, who was found through an executive search firm and was neither involved in the Series–B Investment nor associated with the Series–B Investors. *Id.* Also, David Roodberg's title changed from Chief Operating Officer to Chief Financial Officer. *Id.*

## D. Draft Agreement

TT asserts that an earlier draft of its agreement with CIBC (Def.'s Ex. A, henceforth, the "Draft Agreement") provides evidence that the parties did not intend a sale of securities such as the Series–B Investment to be covered by the Final Agreement. Def.'s Mem. in Opp. to Summ. J. ("Def.'s Mem.") at 2. The Draft Agreement reads, in pertinent part:

> The Company [TT] hereby engages CIBC World Markets as both its exclusive agent in the private placement of one or more classes or series of securities of the Company to a limited number of sophisticated investors (the "Investors") and its exclusive financial advisor in connection with a possible sale or other transfer, directly or indirectly and whether in one or a series of transactions, of all or a significant portion of the assets or securities of the Company or any extraordinary corporate transaction involving a change in control of the Company, regardless of the form or structure of such transaction (such sale or other transfer, the "M & A Transaction"). Such securities in a private placement (the "Securities") may take the form of subordinated debt, preferred stock or common stock, or securities convertible into or exchangeable for or accompanied by warrants or other rights exercisable for or giving the holder thereof the right to purchase common or preferred stock (such placement shall be referred to, individually, as the "Financing Transaction" and, collectively, with

the M & A Transaction, as the "Transaction").

Draft Agreement. Based upon the changes from the Draft version to the Final Agreement, TT contends that the Series B Investment is a "Financing Transaction" which is not encompassed by the Final Agreement and, therefore, that no fee is owed.

### E. The Dispute

While CIBC asserts that they played an active, albeit relatively minor, role in facilitating the Series–B Agreement, Lubin Aff. at ¶ 12–19, for the purposes of this motion, we accept as true TT's assertion that "CIBC had nothing to do with the negotiation or execution of the Series–B Agreement." Pechenik Aff. at ¶ 27. On June 12, 2000, the morning of the closing of the Series–B Investment, representatives of TT and the Series–B Investors met with Mr. Lubin. Pechenik Aff. at ¶ 30–31. At this meeting, CIBC requested to be paid the transaction fee that is the subject of this litigation. *Id.* Thereafter, on or about June 19, 2000, CIBC sent TT an invoice, for its fee and out of pocket expenses, in the amount of $764,515.95. Pl.'s Rule 56.1 Statement of Facts at ¶ 20. TT refused to pay this invoice, *Id.* at ¶ 21, and this litigation ensued.

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is properly granted " 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that the moving party is entitled to judgment as a matter of law.' " *R.B. Ventures, Ltd. v. Shane,* 112 F.3d 54, 57 (2d Cir.1997) (quoting Fed.R.Civ.P. 56(c)). The Federal Rules of Civil Procedure mandate the entry of summary judgment

"against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In reviewing the record, we must assess the evidence "in the light most favorable to the non-movant and ... draw all reasonable inferences in [that party's] favor." *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.,* 902 F.2d 174, 177 (2d Cir.1990). The mere existence, however, of an alleged factual dispute between the parties will not defeat a motion for summary judgment. In order to defeat such a motion, the nonmoving party must affirmatively set forth facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is "genuine ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. 2505 (internal quotation omitted).

### B. Applicable Law

The Final Agreement states that "this letter agreement will be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflicts of law." Final Agreement at 4. Thus, New York law will be applied to the present dispute.

### C. Contractual Ambiguity

■ The parties agree that they intended to, and did in fact, enter into a written contract whose terms are embodied in the Final Agreement. Pl.'s Rule 56.1 Statement of Facts at ¶ 1, Def.'s Rule 56.1 Statement of Facts at ¶ 1. Under New York law, "when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced

according to its terms." *W.W.W. Assocs., Inc. v. Giancontieri,* 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 566 N.E.2d 639 (1990).

■ When the terms of a written contract are ambiguous, however, a court may turn to evidence outside the four corners of the document to ascertain the intent of the parties. *Scholastic, Inc. v. Harris,* 259 F.3d 73, 82 (2d Cir.2001); *Curry Rd. Ltd. v. K Mart Corp.,* 893 F.2d 509, 511 (2d Cir.1990). Furthermore, when the language of a contract is ambiguous and there exists relevant extrinsic evidence of the parties' actual intent, summary judgment is precluded. *Mellon Bank, N.A. v. United Bank Corp. of N.Y.,* 31 F.3d 113, 116 (2d Cir.1994); *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan,* 7 F.3d 1091, 1094 (2d Cir.1993). Finally, "[w]hether or not a writing is ambiguous is a question of law to be resolved by the courts." *W.W.W. Assocs.* at 162, 565 N.Y.S.2d 440, 566 N.E.2d 639.

■ Therefore, on this motion for summary judgment, we must decide at the threshold whether the Final Agreement is "ambiguous." Under New York law,

[A] word or phrase is ambiguous when it is capable of more than a single meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.

*Shepley v. New Coleman Holdings Inc.,* 174 F.3d 65, 70 (2d Cir.1999) (quotation marks and citations omitted). Thus, if contractual terms have a definite and precise meaning and are not reasonably susceptible to differing interpretations, they are not ambiguous. *Seiden Assocs. v. ANC Holdings, Inc.,* 959 F.2d 425, 428 (2d Cir.1992).

## D. Contractual Interpretation

■ First, we address TT's contention that CIBC is not entitled to a fee because they did not introduce the Series–B Investors to TT. Def.'s Mem. at 18. This contention is without merit as the Final Agreement between TT and CIBC states that CIBC is entitled to a transaction fee, "if, during the term of this engagement or within six (6) months thereafter, a Transaction is consummated or an agreement is entered into that subsequently results in a Transaction." Final Agreement at 2. This clause creates an unambiguous duty on the part of TT to pay the fee if the stipulated Transaction occurs. First, it is written in the passive voice, thus demonstrating that there is no requirement that CIBC take any action at all to earn their fee. All that must occur is that a qualifying Transaction be "consummated" or "entered into" by TT. *Id.* Second, there is no language in the Final Agreement stating that CIBC must identify the party or parties to a Transaction with TT as a condition to receiving its transaction fee. Thus, the mere fact that CIBC did not locate or identify the Series–B Investors is wholly irrelevant to whether TT is obliged to pay a transaction fee to CIBC.

■ We now turn to the issue of whether the Final Agreement is ambiguous, such that reference may be made to parol evidence to discern the parties' intentions. Not surprisingly, plaintiff and defendant each posit different definitions for the word "Transaction," as used in the Final Agreement. Under TT's definition, the Series–B Investment does not qualify as a Transaction and, thus, CIBC is not entitled to a transaction fee, while under CIBC's definition, the Series–B Investment does indeed qualify as a Transaction, and, thus, it is entitled to a fee.

TT asserts that the Final Agreement requires a given transaction to meet two requirements in order to be deemed a Transaction covered by the contract. Def.'s Mem. at 7. According to TT, a Transaction either (1) involves a sale or transfer of a significant portion of TT's securities *or* (2) is an extraordinary corporate transaction, *and,* in either case, (3) it must involve a change in control of TT. *Id.*

CIBC, on the other hand, argues that a Transaction either (1) involves a sale or transfer of a significant portion of TT's securities *or* (2) it is an extraordinary corporate transaction involving a change in control of TT. Pl.'s Mem. in Further Support of Mot. for Summ. J. ("Pl.'s Reply") at 4–5.

■ Contractual language "whose meaning is otherwise plain is not ambiguous merely because the parties urge different interpretations in the litigation." *Metropolitan Life Ins. Co. v. RJR Nabisco Inc.,* 906 F.2d 884, 889 (2d Cir.1990) We conclude that the language of the Final Agreement is unambiguous, and that a plain and grammatically correct reading of the Final Agreement supports CIBC's position. Thus, reference to parol evidence is not warranted.

For the reasons that follow, we find that the Series–B Agreement was *both* a significant transfer of securities as well as a transaction that resulted in a change of control of TT. Accordingly, even assuming, *arguendo,* that TT's reading of the Final Agreement is correct, CIBC would still prevail.

### (i) *Significant Transfer of Securities*

■ Following the Series–B Investment, 62% of the shares of TT ended up in the ownership of entities that had not previously owned any shares of TT. TT argues that whether a significant portion of its securities were transferred in the Series–B Investment is inherently a question of fact. Def.'s Mem. at 13–14. Given the facts before us, however, we find that the arguable ambiguity of the term "significant" is immaterial. While it is true that, within a certain range, the term "significant" is vulnerable to differing interpretations of numerical value, there can be no doubt that a transfer such as that involved in the Series–B Investment, is significant.

### (ii) *Change in Control*

The Series–B Investment also resulted in a change of control of TT. In making such a determination, we note that the four votes given to the Series–B Investors produces a simple majority on a seven member Board. However, this factor is not the basis for our determination as the four votes given to the Series–B Investors are divided equally between J. Net and Vistaar and there is no reason to believe that these two companies will always have identical interests or have otherwise agreed to vote as a bloc.

TT argues that because no single person or entity controlled the Board, control of the Board did not change. Def.'s Mem. at 17. This argument is *non sequitur.* Accepting TT's assertion that no single entity controls TT, it is clear that control of TT is shared among an alliance of sorts. Changes in the alliance controlling TT are, in fact, changes in control of TT. It is clear that a change in control of the majority of a seven member Board of Directors is within the plain meaning of the terms "change of control" of TT.

As evidence that the Series–B Investors did not take control of TT, the defendant points to several stipulations in the Designation of Rights that limit the actions that can be taken by the Series–B Investors' Board Members, acting as a bloc. Def.'s Mem. at 17 n. 5. In fact, this evidence

contradicts defendant's position as such stipulations are only necessary if the Series–B Investors acquired, through their designated Board members, the capacity to control TT.

### III. CONCLUSION

Having found that the Series–B Investment involved a significant transfer of securities and a change in control of TT, it was within the contractual definition of a "Transaction" for which a fee is due under either party's reading of the Final Agreement. Thus, we need not analyze whether the Series–B Investment is an "extraordinary transaction".

For the reasons stated, plaintiff's motion for summary judgment is granted and the Clerk of the Court is respectfully directed to forthwith enter judgment in favor of the plaintiff in the sum of $764,515.95 with prejudgment interest to run from June 12, 2000.

**IT IS SO ORDERED.**