## In re ADELPHIA COMMUNICATIONS CORP., et al., Debtors.

## ML Media Partners, LP, Plaintiff,

### v.

## Century/ML Cable Venture, Adelphia Communications Corp., Century Communications Corp., and Highland Holdings, Defendants.

### Bankruptcy No. 02–41729 (REG). Adversary No. 02–02544.

United States Bankruptcy Court, S.D. New York.

Jan. 17, 2003.

---

4. See Footnote 2, above.

Proskauer Rose, LLP, New York City, by Bradley I. Ruskin, John W. Ritchie, Jeffery W. Levitan, Karen Coombs, for ML Media Partners, LP.

Willkie, Farr & Gallagher, Adelphia Communication Corp. and Century Communications Corp., New York City, by

Roger D. Netzer, Michael W. Leahy, for defendants.

Daniel J. Aaron, P.C., New York City, by Daniel J. Aaron, for Century/ML Cable Venture.

Dilworth Paxson, LLP, Philadelphia, PA, by Maura E. Fay, for Highland Holdings.

Kasowitz, Benson, Torres & Friedman, LLP, New York City, by Andrew K. Glenn, Lisa G. Laukitis, for the Official Committee of Unsecured Creditors.

Bragar, Wexler, Eagel & Morgenstern, LLP, New York City, by Gregory A. Blue, for the Official Equity Holders Committee.

## DECISION AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

ROBERT E. GERBER, Bankruptcy Judge.

In this adversary proceeding under the umbrella of the jointly administered *Adelphia Communications Corporation* chapter 11 cases—brought by plaintiff ML Media Partners, L.P. ("ML Media"), against defendants Adelphia Communications Corp. ("Adelphia"), Century Communications Corp. ("Century"), Century/ML Cable Venture ("the Cable Venture"), and Highland Holdings ("Highland")—the Court has before it cross-motions for summary judgment, based on conflicting interpretations of the Leveraged Recapitalization Agreement (the "Recap Agreement") that those parties entered into in December 2001, which required, among other things, for the payment, subject to adjustments, of $275 million (the "Put Payment") to ML Media to buy out ML Media's share of the Cable Venture.[1]

---

1. The issues addressed here follow those discussed in the Court's opinion on ML Media's motion to dismiss, for abstention and for re-

mand, discussed in *ML Media Partners, LP v. Century/ML Cable Venture (In re Adelphia*

Plaintiff ML Media seeks a determination, as a matter of law, that the date for the payment by the Cable Venture of the Put Payment was accelerated from the September 30, 2002 date under which the Put Payment otherwise would be due (assuming that the Recap Agreement is enforceable, a matter that Adelphia, Century and the Cable Venture dispute, based on contentions that the Recap Agreement was a fraudulent conveyance) to one or another of June 7, 2002 or July 1, 2002,[2] and that the date for payment by Adelphia and Highland of the Put Payment (which was due one business day after the due date for the Cable Venture, in the event the Cable Venture failed to make payment) was accelerated to June 10, 2002, or July 2, 2002, respectively. The defendants Adelphia, Century, Cable Venture and Highland seek a determination, as a matter of law, that the date was *not* accelerated.

For the reasons that follow, the Court determines that it cannot grant any of the motions as a matter of law, and that if these matters remain relevant,[3] they can be determined only with the assistance of parol evidence and after trial. The Court can and does find, as a matter of law, that, assuming that the Recap Agreement is enforceable, payment by the Cable Venture was due on September 30, 2002 (and payment by Adelphia, Century and Highland was due on October 1, 2002, one day later), and that, having failed to make payment, each of the Cable Venture, Adelphia,

Century and Highland is now in default.[4] The Court grants summary judgment to that extent, but only that extent; it is otherwise denied. The Court's analysis in these respects follows.

*Facts*

The bulk of the facts underlying this controversy are not in dispute. However, for the reasons set forth in the discussion below, the Court does not regard those facts as determinative in either side's favor. While the Court believes that ultimately the interpretation of the Recap Agreement requires resort to extrinsic evidence as to which there are disputed issues of fact, it first lays out the undisputed facts by way of background.

*Parties*

ML Media is a limited partnership that was organized as a joint venture between RP Media Management and ML Media Management, Inc.; it is the owner of a 50% interest in defendant Cable Venture, which is a joint venture and hence has the characteristics in law, at least in most respects, of a partnership. Century, which was acquired by Adelphia in 1999 and is now a wholly owned and controlled indirect subsidiary of Adelphia (the parent debtor in Adelphia's jointly administered chapter 11 cases), is the owner of the other 50% interest in the Cable Venture. The Cable Venture, directly or through the ownership of stock, owns and operates two

---

*Communications Corp.),* 285 B.R. 127 (Bankr. S.D.N.Y.2002).

**2.** ML Media's position is based on two separate provisions of the Recap Agreement, discussed in detail below.

**3.** The Court says "if those matters remain relevant" because assuming that the Recap Agreement is enforceable, payment to ML Media is now overdue in any event.

**4.** Three of those entities, Century, Adelphia and the Cable Venture, are, at least at this juncture, debtors under the Bankruptcy Code, and by this finding the Court does not intend also to address rights any of them might have to cure its default(s) under the Recap Agreement, or the claim(s) ML Media might have in the event of a failure to cure. ML Media filed a related motion to compel assumption or rejection by Century of the Recap Agreement, and the Court's ruling on that motion will be forth coming as soon as practicable.

cable television systems in Puerto Rico (the "Systems"). Adelphia has had management control over the Systems owned by the Cable Venture, and has received a management fee, pursuant to a management agreement, for its efforts; though ML Media contends that Adelphia forfeited its right to continue as manager, Adelphia has continued to serve as manager. Disputes arose between ML Media and Adelphia and Century with respect to the management of the Cable Venture, leading to the filing of two adversary proceedings that are now before this Court.

Highland is a general partnership composed of John Rigas and members of his family (together, the "Rigas Family"), who were (and so far as the record reveals, still are) major stockholders of Adelphia, and, until May 23, 2002; were officers and directors of Adelphia and many Adelphia subsidiaries.

*The Removed Actions*

Century, another of the Debtors in the *Adelphia* chapter 11 cases—in fact, the first of what are now the *Adelphia* debtors to file a petition in this Court—removed this and another state court action from the commercial part of the Supreme Court of the State of New York (Hon. Ira Gammerman, J.S.C.) to this Court.

The first of the two removed actions (the "Initial Action"),[5] which was commenced in March 2000, was brought by ML Media against Century, Adelphia, and Arahova Communications, Inc. ("Arahova"), another Adelphia subsidiary and another of the

Debtors in these cases. The action that now comprises this adversary proceeding [6] —the second of the two removed actions, which involves an agreement under which claims in the Initial Action were settled— was initially brought by ML Media against the Cable Venture, Adelphia and Highland. Upon amendment of the complaint after removal to this Court, Century was named as a defendant in this action as well. As described above and below, this action involves the "Recap Agreement," a "Leveraged Recapitalization Agreement," dated December 13, 2001, which, if its terms had been fully performed, would have settled the Initial Action. This action ("the Recap Agreement Action") was filed in state court on June 12, 2002, two days after Century filed its petition with this Court. The next day, June 13, 2002, Century removed both the Initial Action and the Recap Agreement Action to this Court.[7]

*The Recap Agreement*

The parties settled the Initial Action, in which a number of findings adverse to Adelphia had been made by Justice Gammerman, by executing the Recap Agreement. The parties to the Recap Agreement were ML Media, the Cable Venture, Century, Adelphia, and Highland.[8]

Under the terms of the Recap Agreement, the Cable Venture obligated itself to redeem ML Media's share of the Cable Venture (the "ML Media Share") on September 30, 2002 subject to acceleration (the "Closing Date"), as discussed below, for a price, subject to upward adjustments, of $275 million.[9] Highland obligated itself

---

**5.** Adv. Proc. No. 02–2543 (previously Supreme Court, New York Co., Index No. 601298/00).

**6.** Adv. Proc. No. 02–2544 (previously Supreme Court, New York Co., Index No. 602155/02).

**7.** Thereafter, the Cable Venture filed its own chapter 11 petition, making it too a debtor in

this Court. ML Media has disputed the propriety of that filing, however, and has moved to dismiss it, under Bankruptcy Code section 1112(b), for cause.

**8.** Recap Agmt at page 1.

**9.** Recap Agmt at § 2.1.

to arrange for the Cable Venture to obtain up to $300 million of debt financing in order to finance the redemption of the ML Media Share,[10] with, Highland, Adelphia and Century jointly and severally liable to provide the Cable Venture with sufficient funds to pay interest on any indebtedness incurred in connection with the redemption financing.[11]

However, the Recap Agreement further provided that Adelphia was required to purchase the ML Media Share, on the next business day after the Closing Date if the Cable Venture failed to close on its obligation to buy out the ML Media Share for any reason.[12] As further security for the sums that would have to be paid to ML Media under the Recap Agreement, ML Media was granted a security interest in Century's 50% interest in the Cable Venture.[13]

*Acceleration Events under the Recap Agreement*

The September 30 Closing Date in the Recap Agreement was subject to acceleration for a number of reasons ("Acceleration Events"), two of which ML Media has asserted to have taken place. The Recap Agreement provisions providing for those Acceleration Events are the backdrop for the cross-motions for summary judgment here.

### (a) Change of Control Provisions

With respect to the provisions giving rise to the first of the argued Acceleration Events, referred to in shorthand as "the Change of Control Provisions," two sections of the Recap Agreement, taken together, would give ML Media the right to redemption prior to September 30. Sec-

tion 3.3 of the Recap Agreement provided, in relevant part:

> *Acceleration of the Closing Date.* Notwithstanding the provisions of section 3.1 [providing for a September 30, 2002 Closing Date, subject to rights on the part of Adelphia or Highland to close earlier], the closing of the redemption or purchase under this agreement shall be held on the tenth business day after the occurrence of any of the following events . . . ("the Accelerated Closing Date") . . .
>
>   (a) the *closing* of any *Transaction* referred to in section 2.2(a).

Recap Agmt. § 3.3(a) (emphasis added).

Thus, a new, earlier, Closing Date for the redemption of the ML Media Share would occur 10 days after the "closing" of a "Transaction" referred to in Section 2.2(a).

"Closing" as used in § 3.3 was not defined, but § 2.2(a) included, in its relatively lengthy language, a definition of "Transaction." Section 2.2(a) provided, in relevant part:

> The purchase price provided for in section 2.1 shall be subject to increase if (i) pursuant to a transaction initiated or an agreement executed prior to the Closing Date, there *is any change in control of Adelphia (i.e., any transaction that results in control of Adelphia by any individual, entity or group other than the Rigas family)*. . . . Promptly after execution of the agreement or agreements relating to *any transaction referred to in this section 2.2(a) (referred to as the "Transaction")*, Adelphia shall give Seller notice of the Transaction or proposed Transaction and shall furnish to Seller

---

**10.** Recap Agmt at § 8.8(a).

**11.** Recap Agmt at § 8.8(b).

**12.** Recap Agmt at § 1.2.

**13.** Security and Pledge Agreement at pages 1–2.

complete and accurate information with respect to the terms of the Transaction or proposed Transaction, together with copies of all agreements and other documents executed in connection with the Transaction.

(Emphasis added; references to types of transactions not alleged to be relevant are omitted).

In connection with widely reported allegations as to mismanagement of Adelphia by members of the Rigas family, and allegations as to responsibility for transactions under which Adelphia became liable for borrowings for the benefit of Rigas family members ("Co–Borrowing Agreements"), Adelphia and members of the Rigas family entered into an agreement, dated May 23, 2002 (the "May 2002 Rigas Family Agreement"), whose interpretation and significance the parties dispute. It provided, in part:

1. The Rigas Family members (John Rigas, Tim Rigas, James Rigas and Michael Rigas, collectively with the entities directly or indirectly owned or controlled thereby, the "Rigas Family") will resign immediately from the Board of Directors of Adelphia. The Rigas Family members may designate two non-family members to be appointed to the Board until the earlier of December 31, 2006, the sale of the Family Cable Operations, or the repayment of the Rigas Family's obligations.

2. All Rigas Family members resign as officers of Adelphia effective immediately.

3. All Stock owned by the Rigas Family will be placed in a voting trust until all obligations of the Rigas Family to the Company for loans, advances, or borrowings under the co-borrowing agreements or otherwise are satisfied....

The May 2002 Rigas Family Agreement further provided for a considerable array of additional matters, many of which would take place in the future. It further stated:

13. The parties agree, intending to be legally bound, to the foregoing. The parties acknowledge that the implementation of this agreement will require the preparation and execution of definitive documentation and the approval, consent or other action of third parties. The parties will act in good faith and use their commercially reasonable efforts, separately and in cooperation with each other, to implement this agreement. To the extent the parties are not able to agree on definitive documentation of this agreement, the parties agree to submit to binding arbitration pursuant to the rules of the American Arbitration Association to resolve the terms of the definitive documentation of· this agreement.

A press release issued by Adelphia, upon which ML Media relies, provided, in part, that a special committee of Adelphia's "Board announced today that the Rigas family ... has agreed to relinquish control of the Company...." [14]

It has not been asserted that the stock was put into the contemplated voting trust on or about May 23, 2002. Nor, so far as the record reflects, was that done thereafter. Indeed, at least as of the time of oral argument on the motion, negotiations as to the underlying documentation with respect to that arrangement were still underway. Among the agreements allegedly still being negotiated, drafted and executed in order to implement the May 2002 Rigas Family Agreement were the "(a) voting trust agreement, setting forth the terms that will govern operation of the Voting Trust and (b) a security and pledge agreement, setting forth the terms that will

---

14. Press Release, dated May 23, 2002.

govern the anticipated pledge of the Rigas Stock." [15]

While it appears to be undisputed that if the requirements of §§ 3.3 and 2.2(a) were satisfied, there would be an acceleration of the Closing Date (and hence the duty, under the Recap Agreement, to proceed with the redemption of the ML Media Share), the parties are in dispute, based on differing readings of §§ 3.3 and 2.2(a), as to whether the acceleration provisions were triggered as a consequence of the execution of the May 2002 Rigas Family Agreement, or events that took place on or about that day. ML Media argues that a change of control took place at that time, and that the Closing Date was accelerated to ten business days later, June 7, 2002.[16] In that event, Adelphia's obligation to purchase ML Media's interest in the event that the Cable Venture failed to redeem ML Media's share would be accelerated, in ML Media's view, to June 10, 2002.[17]

The defendants dispute that there was such a change of control on May 23—asserting in particular that there was no closing of a "Transaction"—and thus dispute that there was then an acceleration as a consequence of these provisions.

*(b) Cross–Default Provisions*

The second Acceleration Event that has been alleged to exist in this action is based on provisions in the Recap Agreement that could provide for acceleration if Adelphia or any of its subsidiaries had a payment default on any indebtedness in excess of $50 million.[18] The Recap Agreement pro-

vided, in § 3.3(b) for acceleration upon certain events. In a single spaced block paragraph, quoted here in full, it provided for acceleration upon:

> the occurrence with respect to (i) any indebtedness of Adelphia or its subsidiaries for borrowed money in excess of $50,000,000, (ii) any incurred pursuant to sections 8.3(a)(ii) or 8.8, or (iii) the Senior Secured Notes referred to in section 8.15 of either (i) a payment default (and continuation of such payment default until the expiration of any applicable grace period), or (ii) any other default (and continuation of such default until the expiration of any applicable grace period) and the receipt of notice from the lenders that as a result of such default the lenders have taken or intended to take any action to accelerate the indebtedness or otherwise pursue their rights and remedies with respect to the indebtedness.

Recap Agreement § 3.3(b).

This "cross-default" provision, providing in substance for the acceleration of the time to make the Put Payment after a payment default on other indebtedness, is subject to dispute as to its interpretation—focusing on the lack of a showing that Adelphia or any of its subsidiaries received any "notice from the lenders that as a result of such default the lenders have taken or intended to take any action to accelerate the indebtedness or otherwise pursue their rights and remedies with re-

---

**15.** Highland's Disputed Fact Statement at ¶ 4 and Brown Aff. at ¶¶ 4–5; Debtors' 7056–1 Statement at ¶¶ 8–9; and Cable Venture's 7056–1 Statement at ¶¶ 12–13. Highland also argues that the resignations of the Rigas Family were pursuant to an executory contract which has yet to be assumed or rejected by Adelphia. Highland's Disputed Fact Statement at ¶¶ 12–13.

**16.** First Amended Complaint in Adv. Proc. No. 02–2544 ("Amended Complaint") at ¶¶ 5–6.

**17.** Amended Complaint at ¶ 6.

**18.** Recap Agmt at § 3.3(b).

spect to the indebtedness." [19]

Without dispute, payment defaults on other indebtedness occurred on May 15, 2002, and Adelphia's grace periods to cure such defaults expired without cure on June 17, 2002.[20] Based on the language quoted above, ML Media argues that the Closing Date was thus accelerated to July 1, 2002; and that Adelphia, in turn, became obligated to redeem the ML Media Share on July 2, 2002.[21] The defendants do not dispute the underlying defaults, and there is no material issue of disputed fact in this regard. However, the defendants contend that ML Media has failed to take into account permitted cure periods, which would exist under their (but not ML Media's) reading of the Recap Agreement. The issue turns on whether the clause providing for cure periods at the end of § 3.3(b) related only to non-payment defaults, or related to both payment and non-payment defaults.

### (c) Other Relevant Provisions

If there was no Acceleration Event, the duties on the part of the defendants to redeem the ML Media Cable Venture Share matured, under the Recap Agreement, on September 30 and October 1, respectively.[22] There is no dispute as to that fact.

### Discussion

### I.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits . . . show that there is no genuine issue as to any material fact

and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56 (made applicable to this adversary proceeding by Fed. R. Bankr.P. 7056). The moving party bears the initial burden of showing that the undisputed facts entitle the movant to judgment as a matter of law. *Rodriguez v. City of New York,* 72 F.3d 1051, 1060–61 (2d Cir.1995); *Singer Co. B.V. v. Groz Beckert KG (In re Singer Co. N.V.),* 262 B.R. 257, 262–263 (Bankr.S.D.N.Y.2001) ("The initial burden rests on the moving party to demonstrate the absence of a genuine issue of material fact . . ."). Then, if the movant carries this initial burden, the nonmoving party must set forth specific facts to show that there are triable issues of fact, and cannot rely on pleadings containing mere allegations or denials. Fed.R.Civ.P. 56(e). *See also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Kittay v. Peter D. Leibowits Co. (In re Duke & Benedict, Inc.),* 265 B.R. 524, 529 (Bankr. S.D.N.Y.2001) ("[T]he nonmoving party must set forth specific facts that show triable issues, and cannot rely on pleadings containing mere allegations or denials").

In this connection, it is well settled that the court should not weigh the evidence or determine the truth of any matter, and must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348 (summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact

---

**19.** *See* Cable Venture's Statement of Disputed Facts at ¶ 15, quoting Dunstan Aff. at ¶ 2.

**20.** The details, which were confirmed by written stipulation dated September 23, 2002, are not critical to determination of the instant motions.

**21.** Amended Complaint at ¶ 7.

**22.** Recap Agmt at § 1.2.

to find for the nonmoving party"); *Virgin Atlantic Airways Limited v. British Airways PLC,* 257 F.3d 256, 262 (2d Cir.2001); *Lovejoy–Wilson v. NOCO Motor Fuel, Inc.,* 263 F.3d 208, 212 (2d Cir.2001) ("We [ ] constru[e] the evidence in the light most favorable to the non-moving party"). A fact is material if "it might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue of fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

## II.

There appears to be no material difference between the parties with respect to the rules of contractual interpretation to be followed, or the means by which those rules are applied on summary judgment motions.

■ Under New York law, "when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms." *CIBC World Markets Corp. v. TechTrader, Inc.,* 183 F.Supp.2d 605, 610–611 (S.D.N.Y. 2001) (Buchwald, J.) (*"TechTrader "*),[23] quoting *W.W.W. Assocs., Inc. v. Giancontieri,* 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 566 N.E.2d 639 (1990). When the terms of a written contract are ambiguous, however, a court may turn to evidence outside the four corners of the document to ascertain the intent of the parties. *TechTrader,* 183 F.Supp.2d at 611, quoting *Scholastic,*

*Inc. v. Harris,* 259 F.3d 73, 82 (2d Cir. 2001); *Curry Rd. Ltd. v. K Mart Corp.,* 893 F.2d 509, 511 (2d Cir.1990).

■ When the language of a contract is ambiguous and there exists relevant extrinsic evidence of the parties' actual intent, summary judgment is precluded. *TechTrader,* 183 F.Supp.2d at 611, citing *Mellon Bank, N.A. v. United Bank Corp. of N.Y.,* 31 F.3d 113, 116 (2d Cir.1994); *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan,* 7 F.3d 1091, 1094 (2d Cir.1993). "Whether or not a writing is ambiguous is a question of law to be resolved by the courts." *TechTrader,* 183 F.Supp.2d at 611, quoting *W.W.W. Assocs.* at 162, 565 N.Y.S.2d 440, 566 N.E.2d 639.

■ Therefore, the Court must decide at the threshold whether the Recap Agreement is ambiguous with respect to the matters in controversy. *See TechTrader,* 183 F.Supp.2d at 611. Under New York law:

[A] word or phrase is ambiguous when it is capable of more than a single meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.

*TechTrader,* 183 F.Supp.2d at 611, quoting *Shepley v. New Coleman Holdings Inc.,* 174 F.3d 65, 70 (2d Cir.1999) (with *TechTrader* having omitted quotation marks and citations in *Shepley* ). However, if

---

**23.** As is apparent from the discussion that follows, the Court fully concurs with the statements in *TechTrader* with respect to the legal principles to be applied with respect to motions for summary judgment involving contractual interpretation, and finds the *TechTrader* discussion to be as capable, and concise, as any such discussion could be with respect to such matters. Accordingly, the Court adopts the *TechTrader* discussion of such matters wholesale. Ultimately, however, the Court finds the relevant contractual language here to be sufficiently different from that in *TechTrader* as to make summary judgment in this case inappropriate. The reasons for finding *TechTrader* to be distinguishable are discussed below.

contractual terms have a definite and precise meaning and are not reasonably susceptible to differing interpretations, they are not ambiguous. *TechTrader*, 183 F.Supp.2d at 611, citing *Seiden Assocs. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir.1992).

### III

#### A.

■ The first matter at issue is whether an Acceleration Event took place as a consequence of a change of control. Each of ML Media, on the one hand, and Adelphia and Century, on the other, contends that it is correct on this issue as a matter of law. For the reasons stated, the Court subscribes to neither view.

As noted above in connection with the facts, an Acceleration Event would take place if, but only if, there were a "closing" on a "Transaction." Without dispute, from May 23, 2002 onward, members of the Rigas Family ceased to be officers or directors of Adelphia, but they did not cease to be shareholders of Adelphia, with the ability, should they choose to exercise it, to use their voting power in connection with the membership of Adelphia's board of directors.

Whether or not there was a "closing" on a "Transaction" within the meaning of the May 2002 Rigas Family Agreement would of course turn on whether the events in question satisfied that dual requirement.

The applicability of that language is easy to understand in the context of the closing of a sale of corporate stock, or of a merger, where the ability to choose directors would thereafter be forfeited, but it is hardly as clear in the context of an event under which incumbency of directors is given up, but the ability to exercise the power to select directors in the future is at least temporarily retained.

Adelphia and Century argue, with some force, that for "Transaction" to have a meaning in the context in which it was used, it must have been something that contemplated a "closing" (even if, or perhaps especially if,[24] "closing" was not defined), and that there has been no contention here that there was such a closing, in at least some of the ways by which it is commonly used. They argue two things as a consequence: (1) there was not the required closing, and (2) there was not the required "Transaction" either. Their contention is supported, to more than a modest degree, by the language in the Recap Agreement providing for the duty to give the Seller ML Media notice not just of a "Transaction," but of a *"proposed* Transaction" (section 2.2(a), emphasis added), "[p]romptly" following the execution of the agreement or agreements relating to it. That suggests (though it does not compel the conclusion) that at least some agreements would not, by themselves, constitute the "Transaction," but would instead provide the underpinnings of the "proposed

---

**24.** It is arguable, but not wholly clear, that with "closing" not having been specially defined, it was intended to be used in accordance with its common meaning—an event at which the parties "close" and operative documents are, if not also signed at that time, exchanged and/or delivered. *See, e.g.,* J. Downes & J.E. Goodman, *Dictionary of Finance and Investment Terms* (6th Ed.); it provides, as one of the definitions of "close":

[T]o consummate a sale or agreement. In a real estate closing, for example, rights of

ownership are transferred in exchange for monetary and other considerations. At a loan closing, notes are signed and checks are exchanged. At the close of an underwriting detail, checks and securities are exchanged

(emphasis deleted). *See also* the definition of "closing" in Black's Law Dictionary (7th Ed.1999) ("The final meeting between the parties to a transaction, at which the transaction in consummated").

Transaction" as to which the "closing" would take place later. The Adelphia/Century position may further be bolstered by the parties' relatively unusual means of agreement as to mechanisms for resolving disagreement in the event of an inability to agree on future implementing documentation (including by arbitration), as set forth in paragraph 13 of the May 2002 Rigas Family Agreement—as it underscores the parties' recognition of the need to resolve further issues of importance in the future.

Yet ML Media argues, hardly frivolously, that corporations act through their boards of directors, and that when the Rigas Family members resigned from the board (and, though the Court regards this as less significant, as officers), they relinquished the ability to exercise control over Adelphia affairs, especially as compared and contrasted to their ability before the May 2002 Rigas Family Agreement was executed.[25] And ML Media offers an alternate plausible construction—that "Transaction" turns on a *result:* it is a "transaction" that *results* in control of Adelphia by any individual, entity, or group other than the "Rigas family." *See* § 2.2(a) (emphasis added). While the Court has some concerns that this proposed construction fails sufficiently to take into account the additional requirement for a "closing" of any Transaction, the Court is not inclined to reject ML Media's contention out of hand.

The additional contractual requirement in the Recap Agreement for a "closing" distinguishes this case from *TechTrader,* with whose statements of the law of contract interpretation, as previously noted, this Court fully concurs. *TechTrader,* like this case, had a contract to which consequences would attach upon a Transaction, but the Recap Agreement here, unlike the agreement in *TechTrader,* has the *additional* requirement of a "closing." Additionally, in *TechTrader,* a closing on the additional financing, which led to the issuance of new stock and associated changes in the membership of Techtrader's board (*i.e.,* a closing in the traditional sense) did take place—and indeed it was the transaction that was the subject of that closing that resulted in the change of control. The *TechTrader* court was there not faced with the requirement for a "closing," and if it had been faced with such a requirement, it would have found it; both of those matters, which permitted the *TechTrader* court to grant summary judgment there, are missing, or arguably missing, in this case.

In this Court's view, the language in the Recap Agreement is ambiguous in its application to anything other than a transaction accompanied by a closing in the traditional sense (*e.g.,* a disposition of stock or a merger), which would undisputedly result in the loss of the ability to control corporate affairs. Both sides' positions, in this Court's view, are at least reasonable, and parol evidence will be necessary to assist the Court in resolving the ambiguity—determining what "closing," "Transaction" and "control" were intended to mean—and in particular, determining the extent, if any, to which "change of control" was intended to focus on Rigas Family Members exercising control in fact; sitting on the board of directors; having the ability to choose the membership of the board; or

---

**25.** Another point ML Media makes is less persuasive: its contention that Adelphia's 8–K, when stating that members of the Rigas Family "agreed to relinquish control," Adelphia acknowledged the change of control—or, stating it more precisely (as we would have to do in order to find an Acceleration Event), acknowledged the "closing" of a "Transaction" for a change of control. The "agreed to" preceding "relinquish control" is equally capable of being understood to contemplate future activity, and/or a future "closing."

some other possibility.[26] The Court does not rule out the possibility that it might ultimately make a determination of whether or not a change of control took place based on its own independent analysis, as did the *TechTrader* court, but it believes that a determination based on what the *parties* intended in that regard is preferable.[27]

The Court is not now in a position to conclude that either side's position is correct as a matter of law, and both side's motions for summary judgment are accordingly denied.

### B.

■ A second asserted basis for summary judgment in ML Media's favor is its contention that an Acceleration Event took place by reason of Adelphia's payment defaults on other indebtedness.

Without dispute, payment defaults on other indebtedness occurred on May 15, 2002, and Adelphia's grace periods to cure such defaults expired without cure on June 17, 2002. However, it likewise is not disputed that the requisite "receipt of notice" of actions or intentions to take action to accelerate, or otherwise to pursue rights and remedies, never took place.[28] Whether there was an Acceleration Event under such circumstances turns, once again, on the construction of the Recap Agreement, and, in particular, whether the require-

ment of "receipt of notice" was intended to relate to each of clauses (i) and (ii), or just clause (ii).

The relevant contractual language, as contractual language so often appears in corporate documents, appears in lengthy, prolix, single-spaced form, without any apparent effort to make it readable, or, more importantly, clear. By separating the key clauses, the Recap Agreement could have been made more comprehensible, and, more importantly, capable of judicial construction without resort to parol evidence. For instance, it could have been drafted, if intended to conform to ML Media's interpretation, as follows (changing only the formatting, and not the words):

> the occurrence with respect to (i) any indebtedness of Adelphia or its subsidiaries for borrowed money in excess of $50,000,000, (ii) any incurred pursuant to sections 8.3(a)(ii) or 8.8, or (iii) the Senior Secured Notes referred to in section 8.15 of either
>
> > (i) a payment default (and continuation of such payment default until the expiration of any applicable grace period), or
> >
> > (ii) any other default (and continuation of such default until the expiration of any applicable grace period) and [29] the receipt of notice from the lenders that as a result of such default

---

26. Needless to say, as in any contractual interpretation dispute, parties' undisclosed intentions will not be relevant, and the Court will need evidence from which a joint intent can be determined.

27. ML Media argued in its opening brief (at page 15) that *TechTrader* should be dispositive here, and that "[a]s that case holds, a 'change of control' *can* occur when there is a change in the make-up of the Board of Directors, without regard to whether there is a change in the stock ownership." (Emphasis added). *TechTrader* supports that view, but this Court believes that the relevant question here is (in

addition to whether there was a "closing") whether the requisite change of control necessarily *did* occur.

28. Cable Venture's Statement of Disputed Facts at ¶ 15 quoting Dunstan Aff. at ¶ 2.

29. Better yet, with changes of words, it could have been drafted to provide at the point of the footnote reference, "with respect to any other default," or to provide a few words down, instead of "such default," "such other default."

the lenders have taken or intended to take any action to accelerate the indebtedness or otherwise pursue their rights and remedies with respect to the indebtedness.

Likewise, it could have been drafted, if intended to conform to the interpretation offered by Adelphia, Century and the Cable Venture, as follows (once more, changing only the formatting and not the words):

> the occurrence with respect to (i) any indebtedness of Adelphia or its subsidiaries for borrowed money in excess of $50,000,000, (ii) any incurred pursuant to sections 8.3(a)(ii) or 8.8, or (iii) the Senior Secured Notes referred to in section 8.15 of either
>
> > (i) a payment default (and continuation of such payment default until the expiration of any applicable grace period), or
> >
> > (ii) any other default (and continuation of such default until the expiration of any applicable grace period)
>
> and [30] the receipt of notice from the lenders that as a result of such default the lenders have taken or intended to take any action to accelerate the indebtedness or otherwise pursue their rights and remedies with respect to the indebtedness.

Unfortunately, it was not drafted in either fashion, and the Court does not regard the failure to include a comma after the second item in the list (*i.e.*, after the parenthesis following "grace period" in subsection (ii)) as conclusive in determining contractual intent; lists not infrequently leave off the final comma.

It may be that requirements for notice of intention to resort to remedies are more common in connection with non-payment defaults than payment defaults; or, as ML Media suggests, by means of a rhetorical question in its reply,[31] that it is significant that the parenthetical requiring continuation of the default until the expiration of any applicable grace period appears in each of clauses (i) and (ii) (and suggests, impliedly, that the parties knew at least one means to assure that a clause would be understood to apply to each); or, most persuasively, that there was no reason to distinguish between payment and non-payment defaults except for the reason ML Media argues,[32] but these are matters ill-suited to determination on summary judgment. Creditors not infrequently wish to exercise their own remedies when obligations to other creditors (of any kind) go into default, and the words "such default" in the last clause could reasonably have been intended to apply to both types of default. While it may be that upon a full evidentiary record, ML Media will ultimately prevail on the matter, the Court cannot rule in ML Media's favor now as a matter of law.

### C.

█ Additionally, each of the Cable Venture, Adelphia and Century argues that the Recap Agreement may be unenforceable as a fraudulent conveyance.[33] The Cable Venture argues, for instance, that it may be inferred that the purpose of

---

**30.** Better yet, with changes of words, it could have been drafted to provide at the point of the footnote reference, "with respect to either kind of default."

**31.** *See* ML Media Reply at 14.

**32.** *Id.*

**33.** *See, e.g.,* Cable Venture's Statement of Disputed Facts at ¶ 9.

the Recap Agreement is "to give the Rigas family ... control over defendant Cable Venture in a transaction where ...

> (i) Cable Venture pays an inflated price of $275 million for ML Media's 50–percent equity interest, given the fact that the highest bid for Cable Venture was $460 million (internal citations omitted [Dunstan Aff. at ¶ 3] ), and which amount would render Cable Venture unable to pay its creditors (Dunstan Aff. at ¶ 4) (ii) Cable Venture receives nothing in return; (iii) Century gives up one fifth of its 50–percent interest in Cable Venture; and (iv) Highland obtains a 60–percent interest in Cable Venture, for which it pays nothing." [34]

The Court is not sure whether the requisite showings for a fraudulent conveyance could ultimately be made (a matter that may turn, *inter alia*, on evidentiary showings with respect to the value of the underlying cable properties, and debtor insolvency, and/or statutory substitutes therefor),[35] but it regards contentions as to fraudulent conveyance to be sufficient to warrant the denial of summary judgment for this reason as well—though without prejudice to reconsideration or a renewed summary judgment motion after fraudulent conveyance allegations have been fleshed out, and any necessary discovery with respect to that matter has been concluded.

## D.

The Cable Venture also contends that it raised material issues of disputed fact with respect to whether representations and warranties made by ML Media were true.[36] While the Court has some uncer-

---

**34.** *Id.* citing Recap Agreement at ¶¶ 1.1, 2.1, 2.2, 8.8, 8.11 and the Stengel Aff. at ¶ 5.

**35.** The Court is, however, puzzled by ML Media's seemingly overly broad assertion, as argued by ML Media in its Reply (at page 11), that "Courts will not examine the adequacy of consideration." In the context of determining whether or not there has been a fraudulent conveyance, inquiry of that nature would appear to be entirely appropriate. If, as is possible, ML Media meant to say something else and its catch line was simply overly broad, ML Media can clarify its position at such time as fraudulent conveyance allegations are analyzed on their merits. At such time ML Media can likewise argue the fact, assuming it is turns out to be true, that the Joint Venture has no adversely affected creditors.

**36.** They included:

> 4.1 *Authority of the Seller:* Seller and its general partner each has the full power and authority to enter into and perform this agreement in accordance with its terms and the execution, delivery and performance of this agreement by [ML Media] and its general partner each have been duly authorized by all necessary partnership action of [ML Media] and its general partner, as appropriate. Seller is not bound by any contractual or other obligation that would be violated by its execution, delivery or performance of this agreement. This agreement constitutes the valid and binding obligation of [ML Media] enforceable against it in accordance with its terms.
>
> 4.2 *No Conflicts.* Subject to the receipt of the consents and approvals referred to in sections 8.1 and 8.2, the execution, delivery and performance of this agreement by [ML Media] and the sale of [ML Media]'s Interest by [ML Media] pursuant to this agreement will not violate any provision of law applicable to Seller, ... and will not result in the creation of any lien, charge of encumbrance upon [ML Media's] Interest or any of the assets or proprieties of [the Cable Venture].
>
> 4.3 *Ownership of the Interest.* Immediately prior to the closing [ML Media] will be on record and beneficial Interest free and clear of any claim, lien, security interest or other encumbrance, and at the closing [Cable Venture] will receive good and valid title to [ML Media's] Interest, free and clear, of any claim, lien, security interest or other encumbrance....

tainty as to whether the Cable Venture's fraudulent conveyance and related contentions could be elevated into the breaches of representations and warranties it claims, the Court does not need to address these matters, as it has concluded that summary judgment must at this juncture be denied in most respects in any event.[37]

### Conclusion

Accordingly, summary judgment is granted to the extent of determining that assuming that the Recap Agreement is enforceable, payment by the Cable Venture was due on September 30, 2002 (and payment by Adelphia, Century and Highland was due on October 1, 2002, one day later), and that, having failed to make payment, each of the Cable Venture, Adelphia, Century and Highland is now in default.[38] It is otherwise denied.

SO ORDERED.

---

[37]. For the same reason, the Court does not need now to address Highland's contention that it would be inappropriate or unjust to subject Highland to summary judgment when Adelphia or Century might thereafter assume the Recap Agreement.

[38]. This is a different issue than that as to whether ML Media would have a claim for alleged loss at the earlier time of Century's and Adelphia's filing dates, see Bankruptcy Code 502(a)(1), and/or for rejection damages if it were to turn out that the Recap Agreement is an executory contract that has not been assumed.